*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 13**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Petitioner*,

*v.*

TRACY SCOTT,
*Respondent*.

No. 20170518
Heard April 11, 2018
Filed March 9, 2020

On Certiorari to the Utah Court of Appeals

Fourth District, Provo
The Honorable David N. Mortensen
No. 131400842

Attorneys:[1]

Sean D. Reyes, Att'y Gen., Tera J. Peterson, Asst. Solic. Gen.,
Salt Lake City, David S. Sturgill, Lance E. Bastian, Provo,
for petitioner

Margaret P. Lindsay, Douglas J. Thompson, Provo, for respondent

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PEARCE joined.

JUSTICE PETERSEN, opinion of the Court:

¶1    Tracy Scott contends that his lawyer provided ineffective assistance as Scott stood trial for the murder of his wife, Teresa

---

[1] A*micus curiae* attorneys are:
Jennifer Springer, Jensie L. Anderson, Salt Lake City, for Rocky Mountain Innocence Center.

Scott. Scott admitted at trial that he shot Teresa.[2] But he maintained that he did so while under extreme emotional distress caused by her threatening behavior. When Scott tried to testify about a specific threat he claimed Teresa had made a few days before the shooting, however, the trial court excluded the testimony on hearsay grounds.

¶2   It is undisputed that the threat was not hearsay and should have been admitted. Nevertheless, Scott's trial counsel did not make this argument, and the jury never heard the content of the threat. The jury ultimately convicted Scott of murder, and he appealed.

¶3   Scott argued in the court of appeals that his lawyer's failure to argue that the threat was not hearsay constituted ineffective assistance. The court of appeals agreed and reversed his conviction.

¶4   The only issue before us is whether the court of appeals erred in that determination. Because the court of appeals did not have before it the content of the threat, we conclude it did err. Without the content of the threat, there was insufficient information to conclude that counsel's course of conduct was deficient or prejudicial. We reverse and remand.

## BACKGROUND

¶5   The Scotts' nineteen-year marriage was marred by arguments and violence.[3] Their two sons saw many fights at home and considered Scott to be "responsible" for most of them. While Teresa would get mad and yell, Scott would get "aggressive" and "physical." Once, the boys saw Scott throw a towel at Teresa's face and start "punching her in the gut." Another time Scott "slammed" a vacuum into Teresa's legs.

---

[2] Because the defendant and victim share a last name, we refer to the victim by her first name with no disrespect intended by the apparent informality.

[3] On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly. *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565. We present conflicting evidence when necessary to provide a full and fair understanding of the issues on appeal. *Id.*

¶6 The sons heard Scott threaten to kill Teresa "multiple times." He told her that "one of these days I'm going to kill you." In fact, on an earlier occasion, Scott had tried to run Teresa over with their SUV while the boys were in the backseat, but Teresa was able to jump out of the way.

¶7 The boys heard their father tell their mother that "she was worthless." And he would "cuss" at her "a lot," calling her names like "bitch" or "just anything to put her down, that could hurt her and make her feel like she was a bad person." He used the contact name "Bitch Teresa" for her in his cell phone during the two weeks leading up to her death.

¶8 In 2008, Scott was arrested and pleaded guilty to domestic violence assault. Afterwards, Teresa obtained a protective order and they separated temporarily. But they soon reunited and she helped him get his conviction expunged.

*The Shooting*

¶9 Scott testified at trial and gave his version of the events leading up to the moment he killed his wife. The day before the shooting, he went into their bedroom and found Teresa crouched at the end of the bed. As he left the room, he noticed their gun safe had been pulled from its usual location under a dresser and was open. He saw one pistol in the safe and noticed that Teresa's gun was missing. Scott testified that this made him "scared to death."

¶10 The next day—the day of the shooting—Scott had difficulty "thinking straight" and struggled to complete simple tasks. Teresa and Scott were fighting throughout the day. Scott took a break from working in the garage to use the bathroom. As he walked through the master bedroom, he saw that the gun safe was out from under the dresser again, open, with one gun still missing. Earlier that day, the safe had been in place under the dresser. Teresa was sitting on the bed with crochet work in her lap. Scott did an about-face and left the house without using the bathroom.

¶11 Scott "didn't dare go back in the house" and instead stayed in the garage. He looked up several times to see Teresa leaning out the garage door staring at him. This caused Scott to "wig out." Agitated and nervous, Scott made several phone calls before deciding to "go in there and confront th[e situation]."

¶12 Scott walked into the kitchen and overheard Teresa on the phone talking to her mother. He picked up the other headset

and said, "[M]y wife and my mother-in-law are saying bad things about me." Then, Teresa "said something" to Scott and he "snapped" and saw "red."

¶13    Scott charged into the couple's room and found Teresa lying on the bed pointing her cell phone at him. Scott glanced at the gun safe and saw that Teresa's gun still was not there. But his gun was. He reached into the safe, grabbed his pistol, and shot her three times. He then called 911.

¶14    The State charged Scott with domestic violence murder.

*The Trial*

¶15    At trial, Scott admitted to killing Teresa, but he argued that he had acted under extreme emotional distress caused by Teresa's threatening behavior and the missing gun. If accepted by the jury, this defense would have reduced the murder charge to manslaughter.

¶16    In his opening statement, defense counsel explained to the jury that "it's more serious for somebody to think about, plan out, coldly and calmly kill somebody. And it is less serious if somebody does it under what is called extreme emotional distress." Counsel told the jury that he would present evidence that Scott and Teresa fought constantly and their fighting "escalated" in the weeks before the shooting. Counsel stated that the day before the shooting, Scott called his mother and said, "Mom I'm afraid. The gun safe is open and a gun is missing. And I think Teresa is going to kill me." Counsel told the jury that when Scott heard Teresa talking to her mother on the phone the next day, "hamm[ing] it up" and trying to "twist the screws and antagonize him," Scott snapped and shot her.

¶17 Scott testified at trial. On direct examination, he attempted to recount a threat he claimed Teresa had made to him days before the shooting. Scott's attorney asked him what he thought when he saw that Teresa's pistol was missing from their gun safe. Scott answered, "I was thinking something that Wednesday there was a threat made. And so when I came in and seen that, I thought the threat was serious." Counsel asked, "[W]ho threatened who?" and Scott began to explain what the couple had been fighting about. But the State interrupted Scott's answer with a hearsay objection. And the trial court sustained the objection and called the lawyers up to a sidebar during which he cautioned defense counsel.

THE COURT: Just a minute. There's no way that you're going to dance around and get [in] a threat without [it] being hearsay. The only two people in the room is this, so get away from this—

[THE STATE]: I think it needs to stop right now.

[DEFENSE COUNSEL]: Okay.

¶18   When counsel resumed questioning, he asked Scott, "After you saw the safe opened, and you went into the garage, . . . then what were you thinking?" Scott answered, "I was thinking that the threat that I had received the day before—" at which point, the State again interrupted with a hearsay objection, which the court also sustained.

¶19   The State requested another sidebar, during which the court warned Scott's counsel to stay away from that line of questioning because "the only responses I'm getting are clearly hearsay." Scott's counsel acquiesced, and Scott did not mention the threat again. The specific words of the threat were not introduced at trial and are not part of the record on appeal.

¶20   At the end of trial, the court instructed the jury on the elements of extreme emotional distress as follows:

A person acts under the influence of extreme emotional distress when the then existing circumstances expose him to extremely unusual and overwhelming stress that would cause the average reasonable person under that stress to have an extreme emotional reaction as a result of which he experienced a loss of self-control and ha[d] this [sic] reason over[borne] by intense feelings such as passion, anger, distress, grief, excessive agitation or other similar emotions.

The instructions also stated that "'emotional distress' does not include . . . distress that is *substantially caused* by the defendant's own conduct." (Emphasis added.)

¶21   During deliberations, the jury sent two notes to the court that indicated confusion regarding the meaning of extreme emotional distress. One note asked, "What is the legal definition of 'substantially caused?'" The next note said that the jury was "at an absolute impasse. 6-2" and that "[t]wo feel that 'substantially caused' needs to be 'the majority of the time.'"

¶22 The court gave the jury a supplemental instruction encouraging them to keep working toward a resolution, which the jury reached two hours later. The jury found Scott guilty of murder, and the court sentenced him to fifteen years to life in prison.

*The Appeal*

¶23 Scott timely appealed. He argued in the court of appeals that his trial lawyer provided ineffective assistance because he did not argue that the threat was not hearsay and should be admitted. *See State v. Scott*, 2017 UT App 74, ¶¶ 17, 19, 21, 397 P.3d 837. The State conceded on appeal that the threat was not hearsay, and the court of appeals agreed.[4] *Id.* ¶ 22. Scott also argued that the trial court erred by giving a "verdict-urging" instruction when the jury was at an impasse. *Id.* ¶ 17.

¶24 Scott attempted to develop the record relevant to his ineffective assistance claim. He filed with the court of appeals a motion pursuant to Utah Rule of Appellate Procedure 23B for a remand to the trial court to develop facts relevant to the claim, including the content of the threat. However, the court of appeals rendered its opinion before ruling on the motion, so the record before it did not include the specifics of the alleged threat.

¶25 The court of appeals concluded that Scott's counsel had provided ineffective assistance. *Id.* ¶¶ 1, 35. The court determined that (1) counsel was deficient when he failed to argue that the threat was admissible non-hearsay, *id.* ¶¶ 23–28, and (2) this deficiency prejudiced the defense, *id.* ¶ 34. Accordingly, the court reversed the conviction and remanded for a new trial without addressing the supplemental jury instruction. *See id.* ¶¶ 1, 35.

¶26 We granted the State's petition for certiorari. We have jurisdiction under Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶27 "On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its

---

[4] We also agree that the statement at issue, Teresa's threat, was not hearsay. Rather than being offered for the truth of the matter asserted, the defense offered the statement for its effect on Scott as the listener. *See* UTAH R. EVID. 801(c); *see also State v. Sanchez*, 2018 UT 31, ¶ 15 n.3, 422 P.3d 866.

conclusions of law." *State v. Baker*, 2010 UT 18, ¶ 7, 229 P.3d 650. An ineffective assistance of counsel claim presents a question of law that we review for correctness. *See State v. Ring*, 2018 UT 19, ¶ 18, 424 P.3d 845.

## ANALYSIS

¶28 The sole issue before us is whether the court of appeals erred in concluding that Scott's counsel provided ineffective assistance when he did not counter the State's hearsay objection with argument that the threat was admissible non-hearsay. Ineffective assistance of counsel claims arise under the Sixth Amendment to the United States Constitution, and we evaluate them under the standard articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *See State v. Sessions*, 2014 UT 44, ¶ 17, 342 P.3d 738. To prevail on this claim, Scott must demonstrate that (1) his counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687–88.

## I. DEFICIENT PERFORMANCE

¶29 The State argues that for Scott to meet his burden of establishing deficient performance, he must "prove that 'no competent attorney' would have proceeded as his attorney did." (Quoting *Premo v. Moore*, 562 U.S. 115, 124 (2011).) *Amicus curiae* argue that in quoting this language, the State is asking us to adopt a new deficiency standard that "would transform an already daunting standard to an impossible one."

¶30 In *Moore*, the Supreme Court stated that whether "no competent attorney" would have acted as the allegedly deficient attorney did "is the relevant question under *Strickland*." *Id.* As demonstrated by the briefing in this case, the precise meaning of the statement in *Moore*—including whether it is a synonymous statement of the *Strickland* standard or a new, higher hurdle for defendants to overcome—is an important question.

¶31 As discussed above, we are bound by the United States Supreme Court's precedent on this issue. Since *Moore*, the Supreme Court has not repeated or explained the quoted language, nor has it suggested that this language changes the *Strickland* standard. Accordingly, we accept *Moore*'s analysis as is and will not attempt to expound upon it beyond what the Supreme Court has offered. Based on the Supreme Court's precedent to date, we do not understand *Moore* to change the

deficiency standard announced in *Strickland.* Accordingly, we apply *Strickland* to the facts at hand and ask whether counsel's failure to argue that the threat was not hearsay "fell below an objective standard of reasonableness."[5] 466 U.S. at 688.

¶32   The court of appeals concluded that counsel was deficient because he "failed to correctly use the rules of evidence to support Scott's defense." *State v. Scott*, 2017 UT App 74, ¶ 25, 397 P.3d 837. It found this failure to be "unreasonable, especially in light of Scott's trial strategy, which was to show that his distress originated outside his own behavior." *Id.*

¶33   The court of appeals disagreed with the State's argument that Scott's "counsel had a sound strategic reason not to seek to admit the specific words of Teresa's alleged threat." *Id.* ¶¶ 26–27. Instead, the court found that "admitting its content would only have strengthened Scott's defense." *Id.* ¶ 27. The court of appeals then concluded that Scott had met his burden of showing that his trial counsel's performance was deficient. *See id.* ¶ 28.

¶34   The State argues that the court of appeals misapplied *Strickland* to the facts at hand.[6] Specifically, the State asserts that upon concluding there was no sound strategic reason for counsel's silence, the court of appeals prematurely ended its inquiry and did not reach the question of whether trial counsel's conduct fell below an objective standard of reasonableness.

¶35   The State is correct that the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable. *See Roe v. Flores-Ortega*, 528 U.S. 470, 479, 481 (2000). To be sure, the performance inquiry will often include an analysis

---

[5] In any event, even assuming the "no competent attorney" language were an elaboration of the *Strickland* standard, the parties have not explained how its application to the facts here would alter the outcome of our deficiency analysis.

[6] Scott argues that the State's brief exceeds the bounds of the issue that we certified. He asserts the State may challenge only the correctness of the court of appeals' conclusions, not whether that court applied the correct legal standard. We disagree. In granting certiorari to assess the correctness of the court of appeals' conclusions, we necessarily review whether it applied the correct standards.

of whether there could have been a sound strategic reason for counsel's actions. *See Strickland,* 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (citation omitted)). But this is because such an analysis is often helpful in answering the ultimate question of objective reasonableness. For instance, if the court concludes that the challenged action "might be considered sound trial strategy," *id.* (citation omitted) (internal quotation marks omitted), it follows that counsel did not perform deficiently.

¶36 However, even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient. *See State v. Ray,* 2020 UT 12, ¶ 34, --- P.3d ---; *see also Bullock v. Carver,* 297 F.3d 1036, 1047–51 (10th Cir. 2002). "[A]n attorney's unawareness of relevant law at the time he made the challenged decision does not, in and of itself, render the attorney's performance constitutionally deficient." *Bullock,* 297 F.3d at 1048. The Sixth Amendment "does not guarantee an errorless trial, and 'prevailing professional norms' do not require perfection at trial." *Id.* (citation omitted). So even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable. *Strickland,* 466 U.S. at 687 ("This [analysis] requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."); *see also Ray,* 2020 UT 12, ¶ 32.

¶37 Here, as the State points out, the court of appeals did discuss whether there could have been a tactical reason for counsel's silence. *See Scott,* 2017 UT App 74, ¶¶ 25–28. But this was in response to the State's suggestion that there was such a tactical basis. *See id.* ¶ 26. The State reasoned that counsel may have strategically let the objection stand because the jury might imagine a threat that was worse than the actual words spoken. *See id.* The court of appeals understandably addressed this argument. *See id.* ¶ 27. And as discussed, this inquiry is often helpful in determining deficiency. But it does not complete the analysis of counsel's performance.

¶38 The State argues that without the content of the threat in the record, there is insufficient information to determine whether

counsel's failure to argue for its admission was objectively unreasonable. We agree. Defense counsel did adduce evidence in support of Scott's extreme emotional distress defense: that Teresa had made a threat; that the day before the shooting, Scott noticed the gun safe was pulled out from its usual location underneath their dresser and her handgun was missing; that after the safe had been pushed back under the dresser, he saw on the day of the shooting that the safe had been pulled out again, it was open, and Teresa's gun was still missing; and that Scott was "scared to death" and feared she might kill him. Scott's claim is that, in addition to this evidence, his counsel should have argued to admit the specific words of the threat. But the record contains no information about what this evidence would have been—neither the words and how they were spoken, nor the context of the threat. Without knowing these specifics, it is impossible to conclude that counsel's inaction was objectively unreasonable.

¶39    To draw such a conclusion, we would need to know the specifics of this evidence and consequently how important its admission was to Scott's case. If the specific details of the alleged threat did not add to the evidence counsel did successfully place before the jury, then counsel may have reasonably chosen not to argue for the introduction of these details because he was uncertain how the jury would perceive them in any event. Reasonably effective assistance does not require counsel to correct every error that might occur during a trial.

¶40    But even if counsel mistakenly thought the words of the threat were inadmissible hearsay, Scott must do more than claim his lawyer made a mistake. He must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Here, the crucial question is whether the evidence was sufficiently necessary or important that counsel's failure to properly argue for its admission fell below an objective standard of reasonableness. This cannot be determined without knowing the specifics of the threat.[7]

---

[7] Our analysis here should not be interpreted to impact the settled rule that "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." UTAH R. EVID. 103(b). Here, the district court did rule definitively

(cont'd)

¶41   Thus, it was error for the court of appeals to conclude that Scott's lawyer was deficient without considering the content of the threat in its analysis. Where the actual threat was not in the record, there was insufficient information to make this determination.

## II. PREJUDICE

¶42   The court of appeals also held that Scott was prejudiced by his counsel's failure to respond to the State's objection. But whether Scott was prejudiced also depends on the content of the threat.

¶43   "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). The burden is on the defendant to demonstrate a reasonable probability that the outcome of his or her case would have been different absent counsel's error. *See State v. Garcia*, 2017 UT 53, ¶¶ 34–38, 424 P.3d 171. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694.

¶44   The court of appeals reasoned that had Scott's counsel properly introduced the content of the threat, there was a "reasonable probability the jury would have continued to be deadlocked, ending the case in a mistrial." *State v. Scott*, 2017 UT App 74, ¶ 34, 397 P.3d 837. The court was persuaded that Scott's testimony about the content and circumstances of the threat would have "given the jury more evidence on the very point that was in dispute" (whether Scott had "substantially caused" his own extreme emotional distress). *Id.* ¶ 33.

---

that any testimony regarding the alleged threat was hearsay and would not be admitted. Scott has argued that his trial counsel was deficient because he did not argue for its admission at any time. We do not understand Scott to assert that his lawyer should have argued with the court after it ruled. We understand Scott's argument to be that his lawyer failed to make a record that the threat was not being offered for the truth of the matter asserted but for its effect on Scott, and it therefore was not hearsay. We do not intend our analysis to bear in any way upon the meaning or continued vitality of rule 103(b).

¶45 However, without the content of the threat, the record is insufficient to conclude that the outcome of the trial would have been different if it had been admitted. If the threat were not particularly compelling, it is possible Scott would have been harmed by its admission. The actual words of a weak threat could have hurt, rather than helped, Scott's defense because the jury could have viewed his reaction as irrational and disproportionate. Or the specific threat may not have added enough to the overall evidentiary picture already before the jury to impact the outcome of the proceedings.

¶46 Prejudice cannot be determined here without knowing the specifics of the threat. And in determining whether Scott has shown a reasonable probability that admission of the threat would have changed the jury's guilty verdict, this piece of evidence must be considered alongside the "totality of the evidence" that was already before the jury. *See Strickland*, 466 U.S. at 695.

## CONCLUSION

¶47 Without considering the specifics of the threat, it is impossible to determine whether Scott's trial counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). Accordingly, we reverse and remand for the court of appeals to proceed in accordance with this opinion, consider Scott's rule 23B motion, and address his remaining claim regarding the district court's "verdict-urging" jury instruction.

———————————