2020 UT App 147

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LEE ERVIN HEYEN,
Appellant.

Opinion
No. 20180804-CA
Filed October 29, 2020

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 151911025

Brett J. DelPorto, Attorney for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and JILL M. POHLMAN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Lee Ervin Heyen was convicted on multiple counts of raping two fifteen-year-old girls. Heyen argues that he would not have been convicted had his trial counsel (Counsel) insisted that tattoos on his face and neck be covered or at least requested a cautionary jury instruction about them. We conclude that Heyen's ineffective assistance of counsel claim fails and affirm his convictions.

BACKGROUND[1]

¶2      Heyen sold or gave marijuana to two fifteen-year-old girls, S.W. and C.W. He also employed these two girls to sell marijuana. And on separate occasions, he raped them multiple times.

¶3      The first victim, S.W., had asked around her school for someone to sell her marijuana. In response, Heyen's son (Son) introduced her to Heyen. S.W. became friends with Heyen, and the two would "[s]moke [marijuana] and listen to music" at Heyen's apartment. On one occasion at his apartment, Heyen asked S.W. "why [she] hung out with him" and expressed that "he thought that there was a reason that [she] hung out with him other than buying marijuana from him." Heyen then insisted that she sit next to him on the couch. S.W. recalled being afraid of Heyen because he had told her that he had been "involved in some sort of a shooting when he was younger," he had been in prison, and he had "been part of a gang." She also revealed that she was scared because of his "prison tattoos and gang tattoos." Heyen then raped and forcibly sodomized S.W., ignoring her pleas to stop. After the rape, Heyen told S.W. "to stop crying" and that if she "did anything to upset him, there would be consequences." S.W. recalled being worried not only about her own well-being but also that of her family and friends.

¶4      Over the next few weeks, S.W. continued to visit Heyen because she "felt like [she] didn't have a choice." He would pick up S.W. in his car and ask her if she "knew anybody who would

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified).

want to buy [drugs] from him." On two separate occasions, Heyen took S.W. to his apartment where she said that he raped her in similar fashion to the first sexual assault. S.W. also alleged that Heyen forced her to perform oral sex on him on two separate occasions while in his car in a public parking lot.

¶5 The other victim, C.W., became acquainted with Heyen when she asked Son "if he knew anywhere that [she] could get a tattoo at 14 years old, and he told [her] his dad was doing tattoos." Without obtaining her parents' permission, C.W. received five tattoos from Heyen over time. In addition to getting tattooed, C.W. began to "hang out" with Heyen more frequently: "We would just kind of smoke weed together, drink together, have parties, sell." In January 2015, she left her father's house, where she had been living, dropped out of school, and moved to Heyen's apartment. About that same time, C.W. heard a rumor from a friend that she and Heyen were sexually involved. She was upset about the rumor and told Heyen, who responded that they "might as well just make it true." C.W. recalled feeling "terrified" that Heyen was proposing a sexual relationship.

¶6 A few weeks later, after having made threats implying harm to C.W.'s family, Heyen pushed C.W. into his bedroom and raped her. She recalled being "terrified" and "shocked" as Heyen sexually assaulted her. C.W. testified that Heyen sexually assaulted her "multiple times for the next four months," alleging that he raped her about three times a week during this period.

¶7 Heyen was charged with seven counts of rape—four for raping C.W. and three for raping S.W.—that occurred between January and May 2015. He was also charged with three counts of distributing or arranging to distribute a controlled substance, one with respect to C.W. and two with respect to S.W.

¶8 Heyen's defense at trial was that while he may have been involved in drug dealing and practiced questionable parenting,

he did not rape the two victims. Noting that there was no DNA evidence, no photographs, no video, no third-party witnesses, and no text messages to corroborate the victims' allegations of sexual assault, Heyen argued that the accusations of rape were based on "just the words of teenage girls." Thus, challenging the credibility of the two victims was critical to his defense, which is the context in which Heyen's tattoos came into play. Heyen wanted to introduce evidence of a spiderweb tattoo "on [his] penis—a hard-to-miss tattoo that neither alleged victim reported seeing—without opening the door for the state to introduce other tattoo evidence."

¶9     While Heyen wanted the penis tattoo evidence admitted, he argued that the "probative value of [his] prior gang affiliation and [other] gang-affiliated tattoos [was] substantially outweighed by the danger of unfair prejudice." These tattoos were associated with the white supremacy movement: "SAC"[2] written on his forehead, a swastika[3] on his stomach, a broken sun cross[4] on his neck, "Supreme White Power"[5] written under

---

2. "Soldiers of Aryan Culture (SAC) is a large Utah-based white supremacist prison gang." *Soldiers of Aryan Culture*, Anti-Defamation League, https://www.adl.org/education/references/hate-symbols/soldiers-of-aryan-culture [https://perma.cc/ZC6R-937C].

3. "Since 1945, the swastika has served as the most significant and notorious of hate symbols, anti-Semitism and white supremacy . . . . In the United States, the swastika is overwhelmingly viewed as a hate symbol." *Swastika*, Anti-Defamation League, https://www.adl.org/education/references/hate-symbols/swastika [https://perma.cc/A2Q3-NZVF].

4. "The white supremacist version of the Celtic Cross, which consists of a square cross interlocking with or

(continued…)

his neck, and "88"[6] written on the top of his head. In contrast, the State wanted to introduce evidence of the totality of Heyen's tattoos for two reasons. First, the State argued that the "whole picture in context" served to rebut the fabrication claim by showing that it would have been unlikely that S.W. and C.W. would notice the penis tattoo among the many tattoos all over Heyen's body. Second, the State believed that the tattoos, "in conjunction with evidence of Heyen's statements to the victims that he was a member of a gang and had been to prison," would have given credence to the claims that he had threatened S.W. and C.W. and that they took the threats as credible.

¶10   Counsel stipulated to the admission of a number of photographs showing Heyen's tattoos on his face, neck, arms, and hands, but he specifically asked the court to exclude "testimony or pictures of [the] swastika [tattoo] because it didn't have an effect on" C.W. or S.W. The district court essentially

---

(…continued)
surrounded by a circle, is one of the most important and commonly used white supremacist symbols. . . . It is the short 'sun cross' version of the Celtic Cross, surrounded by a circle, that is more commonly used by white supremacists . . . ." *Celtic Cross*, Anti-Defamation League, https://www.adl.org/education/references/hate-symbols/celtic-cross [https://perma.cc/6HFR-TK47].

5. "Supreme White Power" is a common prison tattoo. *SWP*, Anti-Defamation League, https://www.adl.org/education/references/hate-symbols/swp [https://perma.cc/YHZ6-ZBWD].

6. "88 is a white supremacist numerical code for 'Heil Hitler.' H is the eighth letter of the alphabet, so 88 = HH = Heil Hitler." *88*, Anti-Defamation League, https://www.adl.org/education/references/hate-symbols/88 [https://perma.cc/JTT6-ZFDP].

agreed with Counsel in making the following rulings: First, there was a "significant risk" in exposing the jury to "tattoos that obviously symbolize white supremacist content" because the "content of the tattoos" could be "used in a way that would detract the jury's attention away from the facts of this case." Second, the victims could testify that they felt "threatened" because Heyen had told them that his tattoos were "gang tattoos." Third, "the defense's introduction of the evidence of the penis tattoo [would] not open the door to the State being able to introduce evidence of the other tattoos." But the district court cautioned, "[T]here may be other ways in which [the] defense may open the door and it, obviously, needs to proceed carefully, but the mere introduction of that [penis tattoo] evidence wouldn't do it."

¶11    Although Heyen had grown out his facial hair and hair on his head and wore a shirt and tie for trial, some of the tattoos on his forehead, face, neck, and hands remained visible to members of the jury.

¶12    During voir dire, the prospective jurors were asked about the tattoos visible on Heyen's body. None of the eight individuals who were ultimately selected to sit on the jury expressed that they knew the meaning of those tattoos. Six of the eight jurors were expressly asked by Counsel if they knew the meanings of the visible tattoos, and they all denied they did. The remaining two jurors, while not explicitly asked about the meaning of the tattoos in question, both expressed that the tattoos would not impact their judgment: one said the tattoos were in no way "troubling," and the other said that she had tattoos and had "no problem" with Heyen's tattoos.

¶13    At trial, Counsel began his opening statement by suggesting that his client was being unfairly targeted because of his tattoos: "[Heyen] is a man who's the easiest guy to blame. Look at him. Tattoos on his face. Look at the tattoos on his arm,

on his hands. He has tattoos up his sleeve. He's the easiest man to blame." Both S.W. and C.W. testified that Heyen had tattoos all over his body. And S.W. testified that Heyen had described his tattoos as "prison tattoos and gang tattoos." The State also presented several photos of Heyen with his tattoos exposed—including photographs of Heyen's head that clearly showed his SAC, broken cross, and 88 tattoos—that were admitted without objection. Heyen then presented evidence of the penis tattoo, specifically to make the point that it predated the rapes of C.W. and S.W. And both victims testified that they did not see the tattoo on Heyen's penis.

¶14    The jury convicted Heyen on four counts of rape of C.W., one count of rape of S.W., and the three counts of distribution. He was acquitted of the other charges. Heyen appeals.[7]

ISSUE AND STANDARD OF REVIEW

¶15    The primary issue on appeal is whether Counsel was constitutionally ineffective for not concealing Heyen's tattoos during trial. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law, which we

---

7. While the notice of appeal does not distinguish between the convictions for rape and distribution, it does not appear from Heyen's brief or the record that he is appealing the convictions for distribution of a controlled substance. At trial, Heyen stated that he "absolutely" believed that he "should be convicted of selling marijuana." And in his brief, Heyen states that he "acknowledged in open court" that he was "guilty" of the "crime . . . of distributing a controlled substance." Furthermore, Heyen's brief states that "[t]his appeal is from a conviction for rape." Thus, because Heyen has not expressly challenged the jury's verdict on the distribution charges, we limit our analysis to the five rape convictions.

consider de novo." *State v. King*, 2018 UT App 190, ¶ 11, 437 P.3d 425 (quotation simplified).[8]

ANALYSIS

¶16 Heyen appeals his rape convictions, asserting that if Counsel had advised or insisted that he cover the tattoos on his face and neck, "there is a reasonable probability that . . . Heyen would have been acquitted on tenuous allegations from witnesses whose credibility was impeached." Heyen specifically argues that allowing him to appear "in court with his tattoos in full view of jurors" "essentially nullified [the] victory" of the

---

8. Heyen also argues that he received ineffective assistance because Counsel did not request a cautionary jury instruction about the tattoos. But in the single paragraph in his appellate brief in which he makes this argument, he provides no explanation of what that instruction should have been. Without this information, we cannot reach the conclusion that Heyen was prejudiced. "To show prejudice in the ineffective assistance of counsel context, the defendant bears the burden of proving that counsel's errors actually had an adverse effect on the defense . . . . Proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 (quotation simplified). In short, by not providing us with a proposed cautionary instruction, Heyen also cannot demonstrate what difference a cautionary instruction would have made to the outcome of the trial. *See State v. Popp*, 2019 UT App 173, ¶ 29, 453 P.3d 657 ("To establish prejudice, [a defendant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (quotation simplified)).

court's ruling excluding his racist tattoos: "Instead of shielding . . . Heyen from the prejudicial impact of the tattoos, the defense paraded the racist imagery in front of jurors for four days." Thus, Heyen claims that Counsel "was ineffective in usurping . . . Heyen's right to prevent jurors from viewing the racist tattoos."

¶17    To succeed on a claim of ineffective assistance of counsel, Heyen must demonstrate that Counsel's "performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Heyen's] claims under either prong." *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. Thus, we limit our analysis to *Strickland*'s first prong because we conclude that Counsel's performance was not deficient.

¶18    To show deficient performance, Heyen must overcome the presumption that Counsel's decision not to cover the tattoos "falls within the wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689. "The court gives trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (quotation simplified). Moreover, "the question of deficient performance is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Nelson*, 2015 UT 62, ¶ 14, 355 P.3d 1031 (quotation simplified). And "even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient. . . . [T]he ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively

unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350; *accord State v. Ray*, 2020 UT 12, ¶¶ 34–36, 469 P.3d 871.

¶19 Here, Heyen argues that leaving his face and neck tattoos exposed during trial was unreasonable and that "there was no reason to allow jurors to see them." We disagree. There were several obvious reasons for leaving the tattoos uncovered, leading to the conclusion that it was not "objectively unreasonable" for Counsel to allow the jury to see them. *See Scott*, 2020 UT 13, ¶ 36.

¶20 First, because the jury was going to see a good number of the tattoos anyway through admissible photographic evidence, *see supra* ¶ 10, Counsel could reasonably have concluded that covering Heyen's tattoos would have been counterproductive. Covering the tattoos could have left the jury with the impression or room to speculate that the tattoos bore a more significant and offensive meaning than the jury might have otherwise presumed. In addition, Counsel may have feared that any attempt to conceal (e.g., through cosmetics) the tattoos may have been obvious to the jury and caused the jury to regard Heyen with skepticism, as being untrustworthy, or as literally trying to hide something. Thus, considering the circumstances, it was not unreasonable for Counsel to favor transparency concerning the existence of Heyen's tattoos when evidence of them would be presented at trial anyway.

¶21 Second, Counsel attempted to use Heyen's tattoos strategically by suggesting that Heyen was an easy target for prosecution because of his tattoos and not because of the evidence: "Look at him. Tattoos on his face. Look at the tattoos on his arm, on his hands. He has tattoos up his sleeve. He's the easiest man to blame." Counsel went on to say, "When you look at the evidence and when you judge [Heyen], judge him not on the ink on his skin but on the content of the evidence." A significant theme of Counsel's argument at trial was that

Heyen's tattoos made him an easy target for blame from the victims and attack by the prosecution. And the only viable way for Counsel to make this argument was to acknowledge the presence of Heyen's numerous tattoos. Moreover, Counsel used the tattoo on Heyen's penis in an effort to discredit the two victims, and Counsel may have thought the jury would have viewed concealing Heyen's other tattoos as inconsistent. Thus, Counsel could reasonably conclude that any attempt to cover or disguise Heyen's tattoos in light of such a defense could have been perceived as, at the very least, disingenuous by the jury. By avoiding a counterproductive move, Counsel's decision not to cover Heyen's tattoos cannot be viewed as "objectively unreasonable." *See Scott*, 2020 UT 13, ¶ 36.

¶22    Being upfront about the existence of the tattoos—to the point of allowing them to be visible during voir dire—also allowed Counsel to screen the prospective jurors to eliminate those who might bear an overt bias against tattooed persons. By allowing the prospective jurors to see some of Heyen's visible tattoos that the jury was going to see photographic evidence of during the trial, Counsel could reasonably conclude that he had effectively desensitized the jury to the impact of Heyen's tattoos from the earliest stages of the trial. This strategy was reasonable because it allowed Counsel to select jury members who would be dispassionate about Heyen's tattoos from the outset.

¶23    Transparency about the existence of the tattoos, along with their strategic use to paint Heyen as an easy target, was a reasonable decision and, under the circumstances, "might be considered sound trial strategy." *See Strickland*, 466 U.S. at 689 (quotation simplified). "We view Counsel's trial decision as a quintessential question of judgment and strategy. We easily could imagine this appeal being before us under the alternative scenario in which Counsel instead had advised" Heyen to conceal his tattoos. *See State v. Fleming*, 2019 UT App 181, ¶ 12, 454 P.3d 862. Indeed, under that scenario, Heyen might well

have complained that Counsel's decision had caused him to come across as guileful before the jury. Because Heyen does not show that Counsel's actions were unreasonable given the circumstances, he has not established the first *Strickland* prong. Therefore, his ineffective assistance of counsel claim is unavailing.

## CONCLUSION

¶24     We reject Heyen's claim of ineffective assistance because reasonable counsel could have had strategic reasons for leaving Heyen's tattoos exposed during trial, and thus it was not objectively unreasonable for Counsel to do so.

¶25     Affirmed.

_____