**2024 UT App 139**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CORY T. CISSEL,
Appellant.

Opinion
No. 20220963-CA
Filed October 3, 2024

Fourth District Court, Heber Department
The Honorable Jennifer A. Mabey
No. 201500253

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and Connor Nelson,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1 A sheriff's deputy detected the odor of alcohol wafting from the breath of the driver he had just stopped for speeding along a curvy road in the wee hours of the morning. A subsequent test revealed a blood alcohol content (BAC) of .10 and the presence of a metabolite of cocaine in the driver's system. A jury convicted that driver, Cory T. Cissel, of driving under the influence (DUI). Cissel now argues that a jury instruction was flawed, leading to a potential lack of unanimity, and that his trial counsel (Counsel) should have sought suppression of the metabolite evidence. We affirm.

BACKGROUND

¶2     Shortly after midnight one October morning in 2020, a deputy stopped a car for going 54 miles per hour in a 40-mile-per-hour zone where the road was "hilly and curvy." The deputy found Cissel behind the wheel, and as he asked for Cissel's driver license, the deputy could "smell the odor of alcohol coming from his breath." When asked if he had anything to drink, Cissel replied that he had "something to drink" "about three hours" earlier "at a wedding," but Cissel assured the deputy that "he was being safe."

¶3     After verifying Cissel's insurance and license, the deputy asked Cissel to exit his car. The deputy continued to smell the odor of alcohol coming from Cissel's mouth as he talked to him. He also recalled that Cissel "was a little bit unsteady on his feet." The deputy then administered three standardized field sobriety tests (FSTs) to Cissel: a nystagmus test, a walk-and-turn test, and a one-legged-stand test. Based on Cissel's performance of these tests, the deputy determined that Cissel "was not safe to be operating a motor vehicle due to intoxication." The deputy requested that Cissel complete a portable breath test, but Cissel "didn't perform that test."

¶4     The deputy arrested Cissel, and while Cissel was in jail, the police collected a blood sample from him. The test result indicated that Cissel's BAC was .10. Cissel's blood also tested positive for benzoylecgonine (a metabolite of cocaine that indicates recent use), THC (the principal psychoactive component of marijuana), and two metabolites of THC.

¶5     Cissel was charged with one count of DUI and other offenses. The court bound Cissel over, and Cissel pled not guilty. The State subsequently dismissed all counts but the DUI charge before trial.

¶6 At trial, the deputy testified to the events as described above, namely that he had pulled Cissel over because he was speeding, that he could smell alcohol on Cissel's breath, that he observed Cissel was unsteady and administered the FSTs, that he determined that Cissel was impaired, and that Cissel's blood was drawn at the jail and sent to the state lab for testing. On cross-examination, Counsel focused on the deputy's physical handling of the blood sample after it was drawn and before it was sent to the lab.

¶7 Two forensic toxicologists from the state lab also testified. As relevant here, the first toxicologist testified that Cissel's BAC measured .10. On cross-examination, Counsel asked a number of questions about the chain of custody of the blood sample. The second toxicologist testified that Cissel's blood tested positive for benzoylecgonine, which he indicated was a metabolite of cocaine. On cross-examination, when asked if his testimony was that there was cocaine in Cissel's blood sample, the second toxicologist clarified, "My testimony is that there's the metabolite of cocaine, which is what is left after cocaine has been utilized by the body as it's trying to use it up and get rid of it." Additionally on cross-examination, Counsel focused some of his questions on chain-of-custody issues.

¶8 After the State rested, Counsel made a directed verdict motion based on an alleged chain-of-custody problem with the blood sample, which the court denied. Also at this point in the trial, the jury instructions and special verdict form were finalized. The discussion about the instructions and special verdict form took place during a break, which was not recorded. On the record, however, the court summarized that the instructions were modified to include instructions about Cissel testifying and to remove instructions about Cissel not testifying. In addition, the court noted that a resolution was reached about the special verdict form including an enhancement based on Cissel's previous DUI convictions. No objection was stated on the record.

¶9    After recess, Cissel began his defense by taking the stand. He testified that he had attended a wedding on the day of the incident. He insisted that he consumed "no more than" sixteen ounces of beer at around 5:30 p.m. and half a glass of champagne at around 7:00 p.m. He further testified that he had "[j]uice, water, ginger ale and Coke" because he wanted to ensure that he would "be operating any kind of vehicle" in "a safe manner." Based on his height and weight and the amount of alcohol he had, Cissel agreed with Counsel that he had considered it "safe for [him] to drive," especially by midnight.

¶10    Referring to the testimony about the blood sample, the following exchange took place between Counsel and Cissel:

> *Counsel*: Okay. Now, . . . you've heard testimony about a blood sample?
>
> *Cissel*: Yes.
>
> *Counsel*: Did you use cocaine?
>
> *Cissel*: No.
>
> *Counsel*: If there's cocaine or cocaine metabolite in that blood sample, is that your blood sample?
>
> *Cissel*: No.
>
> *Counsel*: So a blood sample that's over .05, is that your blood sample?
>
> *Cissel*: If I'm correct on knowing how that works, no, that my blood level would not have been that high.
>
> *Counsel*: Okay. And your blood sample would not have cocaine in it?
>
> *Cissel*: No.

¶11    After Cissel testified, the defense rested its case. As relevant here, Instruction 24 stated that to convict Cissel of DUI,

the jury had to find beyond a reasonable doubt each of the following elements:

1.     That on or about October 4, 2020;
2.     In Wasatch County;
3.     The defendant, CORY CISSEL,
4.     Did operat[e] or was in actual physical control of a vehicle; and

    a. Had sufficient alcohol in his body that a subsequent chemical test showed that the defendant had a blood or breath alcohol concentration of .08[1] grams or greater at the time of the test; or

    b. Was under the influence of alcohol, any drug, or the combined influence of alcohol and any drug to a degree that rendered the defendant incapable of safely operating a vehicle; or

    c. Had a blood or breath alcohol concentration of .08 grams or greater at the time of operation or actual physical control.

*See* Utah Code § 41-6a-502(1) (providing the statutory foundation for the instruction). The jury was also instructed, "Because this is a criminal case, every single juror must agree with the verdict before the defendant can be found guilty or not guilty."

¶12 During closing argument, the prosecutor explained that the jury had to find beyond a reasonable doubt only one of the three theories identified in Instruction 24. But he added that he

---

1. Oddly, the jury instruction and the prosecutor referred to a BAC of .08 as being the threshold for intoxication. This appears to have been in error. The correct number is .05, and it has been so since December 30, 2018. *See* Act of Mar. 8, 2017, ch. 283 § 3, 2017 Utah Laws 1342, 1343. This apparent error had no bearing on Cissel's conviction since his BAC exceeded both concentrations.

wanted "to really focus on the first one," which was whether Cissel had "sufficient alcohol in his body that a subsequent chemical test showed that [he] had a blood or breath alcohol concentration of .08 grams or greater at the time of the test." The prosecutor then said, "In my hand I have the results of the test. This says that the results of the subsequent chemical test show that the defendant had a blood alcohol level of .10, which is higher than .08. Based on that, if you believe this document and you believe the other things that I've told you, you must find [Cissel] guilty based on" the first theory identified in Instruction 24.

¶13    In his closing argument, Counsel explicitly asserted that the blood sample did not belong to Cissel: "We're asking for a not guilty verdict in this case. The document you have, there's no proof that that's his blood, none at all. . . . [T]here's actually no proof that it's the defendant's blood [in] that sample." Along these lines, Counsel asked the jury to consider alleged problems with the chain of custody that could have compromised the testing of the sample. Of particular importance, Counsel noted the presence of benzoylecgonine in the sample, which he said proved that it could not belong to Cissel, who had testified that he hadn't used cocaine.

¶14    The jury convicted Cissel of DUI. And because he had previously been convicted of two or more DUIs within the preceding ten years, the offense could also be enhanced. *See id.* § 41-6a-502(2)(c)(i). So, following his DUI conviction, evidence of Cissel's previous DUI convictions was presented, and the jury returned an enhancement on the conviction.

ISSUES AND STANDARDS OF REVIEW

¶15    Cissel appeals, asserting that Counsel was ineffective for not seeking a specific unanimity instruction or special verdict form for DUI. In a similar vein, Cissel also claims that the district court plainly erred by not sua sponte issuing a specific unanimity

instruction or special verdict form for DUI. Cissel's final claim is that Counsel was ineffective for not moving to suppress the benzoylecgonine evidence or testimony about the presence of benzoylecgonine.

¶16    "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Lisenbee*, 2022 UT App 19, ¶ 8, 505 P.3d 523 (cleaned up). "Plain error is a question of law reviewed for correctness." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (cleaned up).

ANALYSIS

I. Jury Instruction Claims

¶17    Cissel first claims that Counsel rendered ineffective assistance by not seeking a specific unanimity instruction or a special verdict form to ensure that the members of the jury relied on the same subparagraph of Instruction 24 in reaching a verdict. Cissel relatedly contends that the district court committed plain error in not giving a specific unanimity instruction or providing a special verdict form. Cissel points to the three subparagraphs of Instruction 24, *see supra* ¶ 11, as creating the unanimity problem, arguing that some jurors might have agreed on one of the subparagraphs while others might have selected another. Cissel asserts "that the jury had to agree on at least one of the alternatives unanimously," but given the composition of Instruction 24, he claims that there is simply "no way of knowing whether the jury was unanimous as to any particular alternative."

¶18    "To succeed on a claim of ineffective assistance of counsel, an appellant must show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense." *State v. Rosen*, 2021 UT App 32, ¶ 8, 484 P.3d 1225

(cleaned up). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [an ineffective assistance claim] under either prong." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. And "to demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful . . . . If any one of these requirements is not met, plain error is not established." *State v. Dean*, 2004 UT 63, ¶ 15, 95 P.3d 276 (cleaned up). In this case, we conclude that a reasonable attorney could have concluded, based on the state of Utah's unanimity case law, that there was no unanimity problem with Instruction 24 or the verdict form. And for the same reason, the district court did not commit any obvious error by not stepping in, sua sponte, to amend the instructions or the verdict form.

¶19 The Utah Constitution provides, "In criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10 (Unanimous Verdict Clause). Utah courts have understood this clause "is not met if a jury unanimously finds only that a defendant is guilty of a crime" but does not necessarily reach a unanimous finding as to *which* crime. *See State v. Mottaghian*, 2022 UT App 8, ¶ 55, 504 P.3d 773 (cleaned up), *cert. denied*, 525 P.3d 1256 (Utah 2022). Rather, our constitution "requires unanimity as to each count of each distinct crime charged by the prosecution and submitted to the jury for decision." *Id.* (cleaned up). In other words, "a generic 'guilty' verdict that does not differentiate among various charges would fall short," as would a "verdict of 'guilty of some crime,'" because it "would not tell us whether the jury was unanimous in finding guilt on any individual crime." *State v. Hummel*, 2017 UT 19, ¶¶ 26–27, 393 P.3d 314. But there isn't a unanimity problem if "either the State [informs] the jury which act to rely upon for each charge during its deliberations or the district court [instructs] the jury to agree on the specific criminal act for each charge in order to convict." *State v. Santos-Vega*, 321 P.3d 1, 7 (Kan. 2014), *quoted with approval in Mottaghian*, 2022 UT App 8, ¶ 58, *and State v. Paule*, 2021 UT App 120, ¶ 43, 502 P.3d 1217, *aff'd*, 2024 UT 2, *and State v.*

*Case*, 2020 UT App 81, ¶ 23, 467 P.3d 893, *and State v. Alires*, 2019 UT App 206, ¶ 22, 455 P.3d 636.

¶20      In addition, Utah law does not appear to require unanimity "on alternate manners or means of fulfilling an element of a crime." *Hummel*, 2017 UT 19, ¶ 30. For example, there might be multiple theories behind a charge of theft, but "those 'theories' do not represent distinct criminal offenses with different elements in our substantive criminal law. Instead, they are definitional *examples*—and non-exhaustive ones—of the various means by which someone may commit the single offense of theft." *Id.* ¶ 58.[2] To illustrate, the Utah Supreme Court offered this example:

> The relevant parallel here would be to . . . a murder case with evidence of two alternative means by which it was committed—by poison and by suffocation. There is no distinct crime of murder by poison or murder by suffocation. And for that reason it cannot be said that these distinct theories or means of committing the murder are legally distinct, or more importantly, that they are legal *elements* that must be found unanimously by the jury to have a valid conviction under the Unanimous Verdict Clause.

*Id.* ¶ 62. As the court pointed out, "[i]f unanimity is required as to anything we could call a distinct 'theory' of a crime, our juries would be required to agree on every minute detail presented by the evidence—on whether a murder was caused by suffocation or poisoning, or whether a shoplifter placed a stolen item in his pocket or backpack." *Id.* ¶ 64. This, the court warned, "would set us on a slippery slope without a logical endpoint" that would

---

2. In discussing theft through deception or extortion, the Utah Supreme Court was relying on the statutory scheme in effect at the time. *See* Utah Code §§ 75-6-405(2)(a), -406(1) (2017).

divorce "the requirement of unanimity from the elements set forth in the substantive criminal law" and "open the door to the argument that any and every detail presented by the evidence implicates a distinct 'theory' of the crime charged." *Id.*

¶21 Under this rubric, unanimity cases that have required the presence of a specific unanimity instruction, insofar as we are aware, have all been *multiple-act* cases, meaning that they generally follow a pattern where the number of potentially illegal discrete acts identified by the prosecution exceeds the number of charged acts. Most recently, our supreme court determined that a jury instruction was defective for leading jurors to believe that it was acceptable to render a non-unanimous verdict in a case where evidence of three instances of touching was "not specifically attached" to two charged counts of sexual abuse of a child. *State v. Baugh*, 2024 UT 33, ¶¶ 38, 53; *see also State v. Mendoza*, 2021 UT App 79, ¶¶ 1, 6, 496 P.3d 275 (one count of obstruction of justice where evidence of multiple obstructive acts was presented); *Alires*, 2019 UT App 206, ¶ 22 (in a case involving the sexual abuse of two children, four counts of abuse for six touchings of one child and two counts of abuse for two undifferentiated touchings of the other child).

¶22 A multiple-act unanimity issue may also present itself when a defendant is charged with multiple counts but the jury instructions do not "connect any of the acts . . . to a particular count." *See State v. Chadwick*, 2024 UT 34, ¶ 59. In *Chadwick*, the defendant was charged with four counts of sexual abuse of a child. But the jury instructions "did not instruct the jury that it must unanimously agree on which instance of touching support[ed] each count on which it" found the defendant guilty. *Id.* Our supreme court stated that "our confidence in the unanimity of a verdict is low in *multiple-act cases* when the defendant is charged with multiple counts of the same crime and the jury instructions do not connect a particular act to each count." *Id.* ¶ 45 (emphasis added).

¶23 These are not the patterns we encounter with Cissel. The jury instruction identified only one act: operating a vehicle on the particular date and time in question while under the influence of a substance. The DUI statute—as reflected by Instruction 24—lists three ways the State can show a person committed the single act of operating that vehicle at one time while under the influence: (a) by having a BAC of .05 grams or greater at the time of a subsequent chemical test; (b) by being "under the influence of alcohol, any drug, or the combined influence of alcohol and any drug to a degree that renders the actor incapable of safely operating a vehicle"; or (c) by having "a blood or breath alcohol concentration of .05 grams or greater at the time of operation." Utah Code § 41-6a-502(1).[3] These three means or manifestations of being under the influence do not represent separate acts on the part of the defendant. Rather, they are the three ways available to the State to show that a charged individual had committed the single act of driving under the influence.

¶24 Here, competent counsel who was familiar with this case law could have reasonably concluded that there was no unanimity problem with Instruction 24 because it identified not three separate *acts* but three alternative *means* of satisfying the element of being under the influence. In like manner—given that there was one charge, one act, and one crime—there is no clear precedent that would have alerted the district court that a unanimity issue existed with Instruction 24. One charge for one act simply doesn't fit the paradigm readily apparent in our case law that would have alerted Counsel or the district court to any unanimity issue with Instruction 24.

¶25 In sum, given the state of Utah's unanimity case law, Cissel has failed to demonstrate that Counsel performed deficiently, and he has likewise failed to show that the district court committed

---

3. Again, the instruction was at odds with the statute as it had been amended. *See supra* note 1.

any obvious error. We therefore reject Cissel's claims of ineffective assistance and plain error related to the unanimity issue.

## II. Suppression of Benzoylecgonine Evidence

¶26  Cissel next asserts that Counsel rendered ineffective assistance for not moving to suppress the benzoylecgonine evidence or testimony about the presence of benzoylecgonine. More specifically, Cissel argues that Counsel should have filed a motion in limine to exclude the benzoylecgonine evidence because of its prejudicial nature.

¶27  To succeed on an ineffective-assistance claim, an appellant must show that "counsel's performance was deficient in that it fell below an objective standard of reasonableness." *State v. Isom*, 2015 UT App 160, ¶ 35, 354 P.3d 791 (cleaned up). In an effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," an appellate "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered *sound trial strategy*." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (emphasis added) (cleaned up). After all, "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

¶28  While in hindsight it might appear that making no attempt to exclude the benzoylecgonine evidence was unwise, allowing this evidence was central to the defense that Counsel advanced at trial, and it is not our place to deny Counsel the indulgence that his conduct fell "within the wide range of reasonable professional assistance." *Id.* In other words, Counsel reasonably declined to object to the benzoylecgonine evidence because he had a viable strategic reason for including it.

¶29 This case turned on the results of the blood test, which documented that Cissel had a BAC of .10, along with benzoylecgonine (the cocaine metabolite), THC, and THC metabolites in his blood. Cissel now claims that Counsel should have done more to exclude the benzoylecgonine evidence.[4] But even without the benzoylecgonine evidence, the blood test presented rather damning evidence that Cissel's BAC was well above the legal limit. Thus, it would have been little help to get the benzoylecgonine evidence suppressed if Counsel still had to deal with the .10 BAC evidence. Instead, he needed to discredit the results of the blood test in its entirety. This is exactly what he tried to do. And he used the benzoylecgonine evidence to aid in this endeavor.

¶30 Counsel explicitly used the benzoylecgonine evidence to discredit the blood test. On direct examination, he asked Cissel if he had heard the testimony about the blood test. Then he asked Cissel if he used cocaine. Cissel denied doing so. Then Counsel asked the following pointed question: "If there's cocaine or cocaine metabolite in that blood sample, is that your blood sample?" Cissel responded unequivocally, "No." Counsel then immediately followed up by asking Cissel if his blood sample would have tested over the legal limit. Cissel answered that, based on his knowledge, his BAC "would not have been that high." And to drive the point home, Counsel revisited the first question: "And your blood sample would not have cocaine in it?" Again, Cissel responded in the negative.

¶31 From this exchange, it's clear that the benzoylecgonine evidence played a pivotal role in Counsel's defense strategy to convince the jury that the blood sample didn't belong to Cissel. In addition to casting doubt on the chain of custody, Counsel

---

4. There is no indication in the record that the THC-related evidence was presented to the jury, and Cissel makes no assertion that it was.

pointed to the benzoylecgonine evidence as proof that the blood sample could not have belonged to Cissel. The message Counsel was trying to convey was clear: Cissel didn't use cocaine; so, if that sample tested positive for benzoylecgonine, it could not have belonged to Cissel. In other words, the benzoylecgonine fit perfectly with Counsel's theory of the case that the blood test wasn't valid because the sample didn't come from Cissel. Rather than attempting to have the benzoylecgonine evidence excluded, Counsel had a reasonable strategic reason for its inclusion.

¶32    Because Counsel had a strategically reasonable basis for including the benzoylecgonine evidence, the claim of ineffective assistance fails. *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 ("If the court concludes that the challenged action might be considered sound trial strategy, it follows that counsel did not perform deficiently." (cleaned up)); *see also State v. Whytock*, 2020 UT App 107, ¶ 27, 469 P.3d 1150 ("In evaluating counsel's performance, courts often examine whether counsel had a strategic reason for taking the challenged action.").

## CONCLUSION

¶33    Cissel's claims fail. There were no problems with the jury instruction sufficient to support Cissel's claims of ineffective assistance or plain error. And Counsel had a reasonable strategic purpose for including the benzoylecgonine evidence.

¶34    Affirmed.

————————