**2021 UT App 106**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LARRY CHARLES DIVINEY,
Appellant.

Opinion
No. 20190778-CA
Filed October 7, 2021

Fifth District Court, Cedar City Department
The Honorable Keith C. Barnes
No. 171500731

Emily Adams, Freyja Johnson, and Cherise M.
Bacalski, Attorneys for Appellant

Sean D. Reyes and David A. Simpson, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGE DIANA HAGEN and SENIOR JUDGE KATE APPLEBY
concurred.[1]

MORTENSEN, Judge:

¶1     Shoeless, bloody, emotional, and carrying her small child,
Ella[2] stumbled into a convenience store just after 3:00 a.m. one
November morning. Soon after, she explained to responding
police officers that her husband, Larry Charles Diviney, had
locked her in their basement apartment and beat her with a

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

2. A pseudonym.

baseball bat before she was able to collect their child and escape. Although Diviney told police a different story—a story that involved him inadvertently hitting Ella with the baseball bat while fighting with an unidentified home intruder—after trial, a jury convicted Diviney of domestic violence in the presence of a child, aggravated kidnapping, and aggravated assault. Diviney appeals, and we affirm.

## BACKGROUND[3]

### *The Attack*

¶2    Convinced Ella was cheating on him, Diviney was suspicious and angry. And during a weekend trip to Las Vegas in the midst of him harboring these beliefs, he punched her in the face and forced her to use drugs with him. But the weekend was only beginning. After arriving back home, and after Ella had put their child to bed, Diviney yelled at her, threw a plate at her, broke a Swiffer mop against the cupboards above her head, and again punched her in the face. Ella fled to the child's room, where she spent the night listening to Diviney moving about in the living room and kitchen.

¶3    The next day, Diviney again began yelling at Ella, this time in front of their child. So Ella left their apartment, child in arm, to visit a nearby park. But Diviney followed, driving past the park multiple times. When the November air started getting cold, when no one answered the door at her father's apartment, and when the dark of night approached, Ella returned home

---

3. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (cleaned up).

and, finding herself without a phone or key, broke a window to get into their apartment.

¶4    When Diviney returned and became infuriated over Ella breaking the window, she told him she had no other choice and asked him to leave. Diviney left, but only long enough for Ella to put their child down for bed, leaving the bedroom door cracked open so she could hear the child while she smoked a cigarette. Soon, Ella saw Diviney arrive at the apartment carrying a baseball bat and she ran outside, screaming for Diviney "not to hurt her" and to leave. He left. Ella retreated to their apartment, but no sooner had she checked on the still-sleeping child, than Diviney returned, bat still in hand.

¶5    Diviney insisted to Ella that he returned only to light a fire to keep Ella and their child warm, and Ella told him he could stay "as long as he didn't try to talk to her." After only ten minutes, Diviney resumed berating Ella, and she walked up the staircase to leave—only to find her way blocked by a locked door. From behind her, Ella heard Diviney say "You're not going anywhere." He then "grabbed her by her hair, pulled her off her feet, and dragged her back down the stairs." Breathless and on her knees, Ella tried to stand, but Diviney hit her head with the baseball bat. When Ella raised her arms in protection, Diviney hit her in the arm. And when Ella tried to stand again, Diviney hit her a third time.

¶6    In a daze, Ella asked for something to stop the blood now flowing from her head. In response, Diviney dragged her by the hair saying, "[F]ine, let's go to the bathroom." The tissue she used to stop the bleeding did not work, but when Ella insisted she needed medical care, Diviney slammed the bathroom door, telling Ella that she was not "going anywhere," that she would "sit there and talk to" him, and that she had "destroyed [his] life and [he was] going to destroy" hers. If she did not answer his questions truthfully, he threatened to hit her again and use a

meat grinder to break her toes. Diviney interrogated Ella about her alleged infidelity, but Ella's insistent denials only made him angrier. Ella recalled that she felt "[e]verything [she] said was just wrong" as far as Diviney was concerned. After being hit "multiple times again," Ella played it safe and started to "agree[] with him." Throughout the ordeal, Ella begged to check on their child to see if he was "hearing this," but Diviney refused.

¶7 When Diviney finally took Ella out of the bathroom, he rebuffed her requests to check on their child and ultimately positioned himself (baseball bat in hand) between her and the door to the outside. "[Y]ou have to understand," he said, "only one of us is getting out of here alive tonight and it's not looking good for you." Diviney became angrier and angrier, and when Ella asked if she could call someone, Diviney taunted, "[G]o, call someone," but "[y]ou'll be dead and I'll be gone before they get here." Suddenly, to Ella's relief, Diviney (who had a history of heart problems) "leaned over, grabbed his chest," sat down, and "passed out."

¶8 Ella snuck past Diviney, collected their child, unlocked the door, and ran into the night without even pausing to put on shoes. She was visibly distressed when she stumbled into a gas station just after 3:00 a.m., bruises on her face, arms, leg, shin, and hip, and bleeding from the gash on her head. After responding police finally succeeded in calming her, she detailed much of what has been described.

¶9 Diviney, on his part, never reported Ella or their child missing, and when police visited the apartment, Diviney was nowhere to be found. The door was locked, but after forcing their way in, police found many things that corroborated Ella's account. When police apprehended Diviney, he told a different story. According to Diviney, on that day he had come home from work to find Ella "making solicitation with the guy across the street," and when he went into the apartment, another man

was in the bathroom. The man allegedly attacked Diviney with a baseball bat, hitting him "in the nose and knocking out some of his teeth." When Diviney got the bat away from the intruder, he swung at the intruder's head, but the intruder ducked, and Diviney "accidentally" hit Ella in the head. According to Diviney, when he offered to take Ella to the hospital, she refused, so Diviney went to bed, and when he woke, Ella and their child were gone.

¶10    Diviney swore this all resulted from Ella's involvement in an ongoing prostitution ring. He alleged that she would leave "the [apartment] to go catch clients" and "used a coded system of lights to communicate with the rest of the ring." Diviney reported that a minor "irritation" on his nose was actually a broken nose that resulted from being hit in the face with the bat, and although he initially denied knowing why the Swiffer mop was broken, he ultimately admitted that he had stomped on it and threw it because he was angry that Ella was "sleeping around with these guys." Diviney maintained that Ella's accusations were false and that she just wanted him in jail.

¶11    The State charged Diviney with aggravated kidnapping, aggravated assault, and commission of domestic violence in the presence of a child.

*The Trial*

¶12    At trial, defense counsel began by telling the jury that "at the core" of the conflict was Ella's "deep-seated fear . . . that she was going to lose her child." This fear was "driven largely because [of] her history with drug use when the child was born," a history that caused Child Protective Services to become involved because she had "admitted to using drugs during her pregnancy." The idea behind this theory was that Ella had framed Diviney for domestic violence to prevent him from reporting her drug use to Child Protective Services. But later, Diviney chose not to testify, a choice that resulted in a lack of

"evidence that [Ella] actually was using drugs at the time of the crime." So defense counsel adjusted the approach, focusing primarily on Ella's credibility, while leaving the door open to the drug-based theory.

¶13　While cross-examining Ella, defense counsel asked her about allegations that, in the months leading up to the abuse, Diviney found a methamphetamine pipe in Ella's belongings and later confronted her when he found a syringe. Ella denied the allegations. When Ella testified that she did not "do drugs close in time to this incident," defense counsel doubled down on the opportunity to question Ella's credibility and to offer evidence of her drug use to support the defense's original theory of the case. Defense counsel elicited testimony that she admitted to taking drugs during the Las Vegas trip, but Ella averred that "the only reason [she] did drugs is because [Diviney] threatened [her] to do the drugs." When pressed on the issue and asked whether her testimony was that "the only time [she had] ever done drugs was that day," she responded, "No, I'm saying there's this incident that was those days. That was the only, for months and months that was the only time."

¶14　Ella denied that she had obtained drugs on the Las Vegas trip, that she solicited men to obtain drugs for her, that drugs were the true basis for the arguments leading up to the abuse, that she had ever "been in any fear of losing" her child, and that she feared Diviney would report her to Child Protective Services for using drugs. As to using drugs during the Las Vegas trip, Ella testified,

> I am absolutely ashamed . . . just ashamed completely. It's not something that I do and so. It was just that, I mean, what I'm trying to say is that what happened, it only, even though it was only one time, I was ashamed of it. And so it was very

> hard for me to bring it to you and talk to you. But I
> wanted to be 100 percent honest, so.

Defense counsel contended that this testimony had "opened the door to where [he] should [have been] able to impeach her" because she had testified that the incident in which Diviney allegedly forced her to use drugs was "[t]he only time" she had used drugs. Specifically, defense counsel proposed introducing criminal records from 2013 regarding "possession of psychotic chemicals," as well as medical records from that May showing a positive methamphetamine test. Having limited his earlier references to drugs during his examination of Ella, defense counsel argued,

> I was happy to confine myself. And I think the
> [c]ourt was fair in its rulings. But now she's laid
> out something that's completely not true and I
> think we have the right to walk through that door.
> And if she admits to the things I ask her, then so be
> it. We'll move on. I don't think we can go much
> further than that. But if she denies it, I would be
> asking that . . . we'd be able to introduce either the
> criminal history or the medical records to
> substantiate that [it] is, in fact, not true.

The State countered by arguing that Ella meant only that this was "the only time that [she] took drugs in the timeframe of [the] Las Vegas" trip. But the court agreed with defense counsel that the testimony "could have been confusing" and thus, allowed defense counsel "to get a clarification from her."

¶15    After conferring with the court and the State about the language necessary to confine the clarification to that narrow issue, defense counsel ultimately asked Ella, "Are you saying that [the Las Vegas trip was] the only time that you have used illegal drugs?" To which Ella responded, "In my lifetime? No."

In the end, defense counsel dropped the initial theory of the case, stating in closing that

> [Ella is] lying, . . . she's making it up. And frankly, I don't know why and you don't know why. But we don't have to prove that. Some people like attention. Some people exaggerate. Some people, I don't know, have ulterior motives. I don't know, you don't know why she may be lying, why she may be saying these things.

Not once during closing argument did defense counsel suggest that drug use provided Ella's motive to lie about the abuse.

¶16 But before the trial ended, Diviney moved for a directed verdict on the count of domestic violence in the presence of a child. Diviney argued that the elements for that charge required that "there has to be at least some possibility that [a child] can, not just a possibility, but that the child is essentially a perceiving witness [of the domestic violence] in some way, shape, or form" and that this element could not be met in this case because the child was asleep. The trial court informed Diviney that it was "not aware" of "anything that suggests that if a child is present physically but is asleep that would make it that it would be improper," and Diviney conceded that his argument relied on the statutory language. The State pointed out that the statutory language defining "in the presence of a child," as referenced in the jury instructions, meant "having knowledge that a child is present and *may* hear, or *may* see, or hear an act of domestic violence." (Emphasis added.) The trial court focused on the operative word "may" and denied the motion, determining that "the State ha[d] produced believable evidence . . . of the elements of the crime charged."

¶17 Diviney appeals his subsequent convictions.

## ISSUES AND STANDARDS OF REVIEW

¶18 Diviney raises three issues for our consideration. First, he contends the trial court erred in denying his motion for a directed verdict on the charge for domestic abuse in a child's presence. "We review the [trial] court's denial of a motion for directed verdict for correctness," and where Diviney "challenges the denial . . . based on the sufficiency of the evidence, the applicable standard of review is highly deferential," and we "will uphold the [trial] court's denial if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt." *State v. Barner*, 2020 UT App 68, ¶ 9, 464 P.3d 190 (cleaned up). Second, Diviney contends the trial court abused its discretion by excluding evidence Diviney proffered to impeach Ella. "We review the trial court's admissibility determination for abuse of discretion." *State v. Gomez*, 2002 UT 120, ¶ 12, 63 P.3d 72 (cleaned up). Third, Diviney contends that defense counsel rendered ineffective assistance in adjusting the defense strategy in response to the trial court's ruling on the evidence. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law."[4] *State v. Bowen*, 2019 UT App 163, ¶ 15, 451 P.3d 1050 (cleaned up).

---

4. Diviney also requests that we remand this case under Utah Rule of Appellate Procedure 23B for the purpose of entering into the record additional facts necessary to support another claim for ineffective assistance of counsel. "We grant such motions only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Curtis*, 2013 UT App 287, ¶ 13, 317 P.3d 968 (cleaned up). "Fact allegations are insufficient unless the defendant presents this

(continued…)

ANALYSIS

I. Motion for Directed Verdict

¶19    Diviney contends the trial court erred in denying his motion for a directed verdict regarding domestic violence in the presence of a child because, he claims, insufficient evidence supported the charge. He asserts that each element of the statute cannot have been met because even though "Diviney knew that [the child] was in the apartment," because the child was asleep, "Diviney did not know that [the child] could 'see or hear an act

_____

(…continued)

court with the evidence [the defendant] intends to present on remand and explains how that evidence supports an ineffective assistance of counsel claim." *Id.* ¶ 18 (cleaned up). Here, Diviney proposes to supplement the record with facts consisting of his medical documents from the day after the incident, which he asserts would have supported his story "that he and [Ella] were injured in a fight with an intruder." While Diviney's motion includes medical documents not included in the record, and although the findings reported on those documents may not be speculative, Diviney has not explained how this evidence supports an ineffective assistance of counsel claim because he does not show how defense counsel's failure to introduce this evidence prejudiced his case. Diviney asserts that the medical documents provide physical evidence for his version of events, but he does not show how this is so. Specifically, Diviney has not pointed to any testimony offered at trial or proposed expert testimony that would connect his version of events to the findings listed in the medical documents. Without such a connection, any supposed effect this information would have on the jury is speculative, and therefore our "confidence in the outcome of the trial is [not] undermined." *See State v. Popp*, 2019 UT App 173, ¶ 58, 453 P.3d 657 (cleaned up).

of domestic violence.'" (Quoting Utah Code Ann. § 76-5-109.1(1)(c)(ii) (LexisNexis 2017).)[5] In other words, Diviney's argument concedes that the child was in a room in the apartment with the door slightly open but maintains that the uncontested fact that the child was sleeping means that the definition of "in the presence of a child" could not be satisfied.[6] We disagree with Diviney's interpretation of the statute and conclude that "some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt." *See State v. Barner*, 2020 UT App 68, ¶ 9, 464 P.3d 190 (cleaned up).

¶20　"When interpreting statutory provisions, we first look to the plain language of the statute," *State v. Rincon*, 2012 UT App 372, ¶ 10, 293 P.3d 1142 (cleaned up), and "in so doing, we presume that the legislature used each word advisedly," *Scott v. Scott*, 2017 UT 66, ¶ 22, 423 P.3d 1275 (cleaned up). If that language allows us to understand the legislature's meaning, "no other interpretive tools are needed, and our task of statutory construction is typically at an end." *Id.* (cleaned up)*.* We conclude that to be the case here.

---

5. The statutory language in effect at the relevant time remains in effect today. Thus, we cite the current code for convenience.

6. In so doing, Diviney relies on *In re K. D.*, 810 S.E.2d 193 (Ga. Ct. App. 2018), a case in which the court found that an incident of assault "took place outside the presence of the children, as the uncontradicted record showed that they were inside the house asleep" and the assault occurred outside of the house. *Id.* at 196. That case is easily distinguished from this case where the abuse occurred inside the same apartment in which the child slept with the door slightly open.

¶21    Regarding domestic violence in the presence of a child, Utah Code section 76-5-109.1(1)(c) provides,

> "In the presence of a child" means:
>
>> (i) in the physical presence of a child; or
>>
>> (ii) having knowledge that a child is present and may see or hear an act of domestic violence.

Diviney concedes that the child "was asleep in his crib in his bedroom" with the door slightly open and that "the acts of domestic violence occurred in another room" in the same apartment. Thus, the focus rests on whether the language "may see or hear" includes a child who is asleep in a nearby room with the door open. *See id.* § 76-5-109.1(1)(c)(ii). We conclude that it does.[7]

¶22    Diviney asserts that Ella's "testimony supported that [the child] could not see or hear any act of domestic violence because he was asleep during the entire incident." However, his argument glosses over not only the statute's use of the word "may," but the trial court's focus on that word as well. *See id.* "The plain, ordinary, and accepted meaning of the word *may* is permissive or discretionary, generally indicating that an

---

7. We also note that the parties appear to concede that the circumstances here do not fall within the definition in Utah Code section 76-5-109.1(1)(c)(i), and instead meaningfully discuss only whether this case falls within the scope of section 76-5-109.1(1)(c)(ii). We, however, do not adopt the legal position espoused by the parties' concession and we do not opine on whether section 76-5-109.1(1)(c)(i) applies here; instead we analyze only whether these circumstances fall within the scope of section 76-5-109.1(1)(c)(ii).

individual is either permitted or has a possibility to do something." *Holmes Dev., LLC v. Cook*, 2002 UT 38, ¶ 25, 48 P.3d 895 (cleaned up) (emphasis added). The statute therefore requires that the jury determine only that a child was present and that a possibility existed that the child would or could hear or see the domestic violence. And to deny the motion for a directed verdict, the trial court needed to find only that some evidence existed that supported that element.

¶23　The State presented such evidence here. Ella testified that the child's bedroom door was "cracked open" so she could "always hear" him. Moreover, because she had spent the night before with the child, behind a closed door, she was able to testify that even with the door closed, one could hear what was happening in other parts of the apartment. In addition, the mere fact that the testimony suggests that the child was asleep during the events does not eliminate the possibility that the child could have heard the abuse. At any moment the child could have woken up, either naturally or due to the commotion in the other room; or the child may have, in fact, woken up, heard the domestic violence, and returned to sleep without Diviney or Ella knowing; and we note that were it not for the fact that many human beings can hear while they are asleep, the ongoing use of sound-based alarms would remain an unexplained curiosity.

¶24　Here, the possibility existed that the child would hear the domestic violence happening just beyond his open bedroom door. As such, the trial court did not err in denying the motion for a directed verdict.

## II. Exclusion of Evidence and Defense Counsel's Adjustment

¶25　Diviney also contends that the trial court "abused its discretion when it did not appear to allow extrinsic evidence of [Ella's] drug use" and that defense counsel rendered ineffective assistance in not impeaching Ella sooner, in not arguing "that the rules of evidence allowed him to impeach [Ella] with extrinsic

evidence" (and, to the extent that it constitutes invited error, in proposing an alternative strategy in light of the court's ruling). But even assuming without deciding that the court erred and that defense counsel rendered deficient performance, each of these arguments falls short for the same reason: lack of prejudice. *See, e.g., Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182 ("Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [a defendant's] claims under either prong."); *State v. Leech*, 2020 UT App 116, ¶ 42, 473 P.3d 218 (noting that even if an error occurs, prejudice still must be shown).

¶26 "Utah law places the burden on the defendant to prove that a preserved error is harmful." *Leech*, 2020 UT App 116, ¶ 43 n.7; *cf.* Utah R. Crim. P. 30(a) ("Any error . . . which does not affect the substantial rights of a party shall be disregarded."). Moreover, defendants bear the burden of showing that they have been prejudiced by counsel's deficient performance. *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350; *cf.* Utah R. Crim P. 30(a). For a preserved error, showing prejudice "requires a showing of a reasonable likelihood that the [alleged error] altered the jury verdict." *Leech*, 2020 UT App 116, ¶ 43 (cleaned up). For ineffective assistance, showing prejudice requires "the defendant to demonstrate a reasonable probability that the outcome of [the] . . . case would have been different absent [the alleged] error." *Scott*, 2020 UT 13, ¶ 43. Thus, where a defendant raises a preserved error argument and an ineffective assistance of counsel argument based on the same alleged issue, and we resolve the argument based on a lack of prejudice, we need undertake only a single analysis. *See id.*

¶27 As an initial matter, Diviney asserts that extrinsic evidence of Ella's drug use would have persuaded the jury that she was motivated to lie to prevent him from reporting her drug use to Child Protective Services. But although that may have been Diviney's initial theory of the case, the State points out that

when Diviney decided not to testify, defense counsel "abandoned the drug-based theory" in favor of attacking Ella's credibility. Without Diviney's testimony about Ella's "supposed drug use at the time of the crime," no evidence supported that Ella was, in fact, using drugs at the time of the abuse, and evidence of a four-year-old criminal record for possession of "psychotic chemicals" and a months-old positive methamphetamine test does not fill that gap.

¶28 Moreover, when it appeared that Ella denied having used drugs generally, defense counsel received permission to follow up on that issue. After being asked whether this was the only time she had used drugs, Ella responded, "In my lifetime? No." In other words, regardless of whether the court allowed specific extrinsic evidence, defense counsel made his main point: arguably contrary to her earlier testimony, Ella admitted she had, in fact, used drugs outside of the Las Vegas trip. Thus, Diviney obtained the same evidentiary posture he would have garnered had the extrinsic drug-use evidence been allowed; that is, he still succeeded in impeaching her testimony on this issue. And although Diviney argues that this admission "was no substitute for powerful evidence that [Ella] had used drugs in the past and recently," we see these additional details as ultimately inconsequential in comparison to her admission that she had otherwise used drugs. We remain unpersuaded that this remote extrinsic evidence provided any more materially significant evidence than Ella herself had already provided when she testified.

¶29 And, even if the information had been allowed, we do not believe this would have made the difference Diviney asserts. According to Diviney, because "[t]he State's case depended on [Ella's] credibility," all that was needed for the jury to "decide whether [Ella] was being truthful on the witness stand" was "[a] sufficient opportunity for the defense to impeach" her. But in his brief, Diviney has demonstrated many inconsistencies defense

counsel "sussed out" during Ella's examination. Diviney asserts that during her examination, defense counsel elicited inconsistencies regarding the plate Diviney threw, the extent of Ella's bleeding, the number of times Diviney hit her, their child's location at different times, the timing of the abuse, and many other things. And yet, despite all these inconsistencies, Diviney maintains that the additional extrinsic drug-use evidence would have infused the case with sufficient doubt that the jury likely would have acquitted him. We remain unconvinced and conclude that among all the other inconsistencies, this additional drug-use evidence would not have likely tipped the scales in Diviney's favor.

¶30 In light of Ella's overarching admission regarding her drug use, a four-year-old criminal record or a months-old positive methamphetamine test were not reasonably likely to have changed the jury's verdict. Accordingly, we conclude that any error regarding this evidence's exclusion did not prejudice Diviney.

## CONCLUSION

¶31 Some evidence supported the jury's verdict, and thus the trial court properly denied Diviney's motion for a directed verdict. Further, the court's exclusion of the impeachment evidence and defense counsel's adjustments in light of that ruling did not prejudice Diviney. Accordingly, we affirm.

_____