**2026 UT App 19**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ALBERTO ARELLANO,
Appellant.

Opinion
No. 20230711-CA
Filed February 12, 2026

Fifth District Court, St. George Department
The Honorable Eric A. Ludlow
No. 201502135

K. Andrew Fitzgerald, Attorney for Appellant

Derek E. Brown and Hwa Sung Doucette,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1 Alberto Arellano was convicted of six counts of sexual abuse of a child for his conduct related to three different victims. He now appeals. As to two of the convictions, he asserts that he was never properly identified at trial as the perpetrator of the abuse suffered by one of the victims and, therefore, that the district court erred by denying his motion for a directed verdict on the counts related to that victim. Arellano also asserts that his trial counsel (Counsel) rendered ineffective assistance as to all of his convictions by eliciting testimony from Arellano's wife (Wife) that was damaging to his case. We disagree with each of Arellano's assertions and affirm his convictions.

## BACKGROUND[1]

*Arellano's Relationship with a Group of Families*

¶2     Arellano and Wife were friends with several families that routinely participated together in activities such as camping, birthday parties, and other gatherings. The children of one family included two daughters—Sister 1 and Sister 2 (collectively, the Sisters). Sister 1 was between nine and ten years old and Sister 2 was between about eight and nine years old at the time of the incidents giving rise to this case. Due to the "trust and rapport" Arellano had developed with their parents, he was named Sister 1's godfather.

¶3     Another of the families had a daughter, Maren,[2] who was between five and seven years old at the time of the incidents giving rise to this case. The Sisters' mother was the godmother of Maren's mother, and the Sisters and Maren were friends. Though Maren was not related to Arellano or Wife, she referred to them as her "tío" and "tía"—Spanish for "uncle" and "aunt."

*The Baker Dam Camping Trips*

¶4     The families occasionally camped overnight together at Baker Dam in Washington County. When they camped at Baker Dam, they would swim in the reservoir. During at least one such camping trip, Arellano touched Sister 1's "vagina" over her swimming suit "in secret" while she was swimming. Arellano

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Diviney*, 2021 UT App 106, n.3, 500 P.3d 883 (cleaned up).

2. A pseudonym.

also touched Sister 2's "private part" at least once over her swimming suit while they were "in lakes."

¶5      The Baker Dam campground had one bathroom facility, which consisted of two fully enclosed stalls. One evening during a camping trip to Baker Dam in 2019, Wife and Arellano took the Sisters and Maren to the bathroom after dark; they needed a flashlight to see the way. Once at the bathroom, the Sisters and Wife went in, leaving Arellano outside with Maren. At that point, Arellano took Maren behind the building, put his hand into her underwear, and touched her "private part." Then he pulled down his pants, took Maren's hand, and made her touch his penis.

*The Outings to the Virgin River Waterfall*

¶6      On other occasions, the group went on outings to a waterfall on the Virgin River. While they were there, Arellano, the Sisters, and other adults and children would play and swim in the water near the waterfall. In the water near the falls were "little holes" where a person could "sit down" and be "under the water." On one outing to the waterfall, while Sister 1 was in one of those holes, Arellano touched her "vagina" over her swimming suit with his hand. In September 2020, Arellano touched Sister 2's "private part" over her swimming suit with his hand while they were at the waterfall to celebrate Wife's birthday.

*The Disclosures of Arellano's Abuse and His Subsequent Arrest*

¶7      In October 2020, the Sisters' mother was decorating for a birthday party for Sister 2 when Sister 2 asked her who would be coming to the party. When her mother indicated that Arellano would be attending the party, Sister 2 disclosed Arellano's inappropriate touching. The mother then spoke with Sister 1 and Sister 2 together, and they told her about Arellano's inappropriate touching of them and Maren.

¶8 Worried that Arellano would flee if confronted, the Sisters' parents went through with the party and said nothing to Arellano about the Sisters' disclosures. But they "check[ed] in with [the girls] constantly" to make sure they were not near Arellano. The next day, the Sisters' father called 911. The Sisters' mother also told Maren's mother that Arellano "was touching the three girls." Several days later, the Sisters and Maren were interviewed at the Children's Justice Center (CJC), where each stated that Arellano had touched her inappropriately.

### The Charges and the Resulting Trial

¶9 Arellano was originally charged by information with eight counts of sexual abuse of a child. The information was later amended to include only six charges. Two of the charges were based on Maren's allegations that Arellano touched her and made her touch him outside the bathroom at the Baker Dam campground. Two of the charges were based on allegations by Sister 1 that Arellano had touched her under the water both at Baker Dam and at the Virgin River waterfall. And two of the charges were based on Sister 2's allegations that Arellano had touched her at both Baker Dam and at the waterfall as well.

¶10 In May 2023, the case proceeded to a three-day jury trial. As part of the State's case-in-chief, the Sisters' parents, Maren's mother, and a detective who had interviewed Arellano testified. The State also played recordings of the Sisters' and Maren's respective CJC interviews,[3] and each of the girls then testified.

---

3. Arellano notes that our review "is strictly circumscribed to the record," and he asserts that the "record does not contain the CJC video recordings nor transcripts from such." However, the State's Exhibit 8 contains the video recordings of the girls' CJC interviews and is part of the record on appeal. *See* Utah R. App. P. 11(a) ("The record on appeal consists of the documents *and exhibits* filed in or

(continued…)

¶11    In her CJC interview, Maren said, pointing to her genital area, that "[her] tío touched [her there]." She said that he did it "more than one time," that "he mostly did it when [they] were alone," and that the "last time he did it [was] when [they] last went camping." She explained that when they were camping, she went to the bathroom with her "tía" and her "tío" and two of her friends. While the others were in the bathroom, she explained, her "tío" "took [her] behind the stall," put his hand into her underwear, touched what she described as the part of her body she uses for "peeing," and moved his fingers. Then, she said, he pulled down his pants, "grabbed" her hand, and made her touch "the part that he pees with." Maren could not remember the name of her "tío" or what other people called him. When asked how other people found out about "what was happening," Maren explained, "I guess it's because . . . [the Sisters] . . . saw him doing that and they told my mom and their mom, . . . and they told me that that's what he did to them too."

¶12    When Maren testified, she said that her family and others, including "people [she] called tía and tío," had gone camping. According to Maren's testimony, during the camping trip, her "tía and tío" accompanied Maren and the Sisters to the bathroom and her "tía" and the Sisters went into the bathroom. Maren said that her "tío" then touched her on her "private part" and that he made her touch his "private part" as well. Maren said, however, that she did not "see the person . . . that [she] called tío in the courtroom." At the end of her redirect testimony, Maren was again asked, "Can you point to who touched you at the bathroom?" and, "Do you feel comfortable about pointing?" She answered, "Not really." Additionally, Maren testified, as follows, that she thought the first person to whom she disclosed the abuse was the Sisters' mother:

---

considered by the trial court . . . ." (emphasis added)). We thus rely on those videos in recounting the contents of the interviews.

Q.      And did you tell anybody?

A.      After we left the bathroom, no.

Q.      But later did you tell somebody?

A.      Yes.

Q.      And who did you tell?

A.      Either I told . . . [the Sisters'] mom first or my mom. I think it was [the Sisters'] mom first.

¶13    During Sister 1's CJC interview, Sister 1 said that her "godfather" "touch[ed] [her] . . . in spots where . . . he's not supposed to." She explained that he would "do it in secret" and that he would "only do it in the water." Sister 1 said that his hand would touch her "private" over her swimming suit. She said that this happened one time "in the lake" and "whenever [they would] go [on] a trip," except she said that he did not touch her during the outing to the waterfall for Wife's birthday.

¶14    At trial, Sister 1 testified that her "godfather" touched her "vagina" with his hand under the water while they were swimming both at "the lake" and at "the waterfall on a different day." She identified Arellano as the person who touched her by indicating that he was the person in the courtroom wearing a blue suit.

¶15    During Sister 2's CJC interview, Sister 2 said that she was there because Sister 1's "godfather . . . was . . . touching [them]." She explained that his touching of her occurred "mostly when [they went] camping or when [they were] in the water," and she said that "the last place he touched [her]" was at Wife's party at a "big waterfall." Sister 2 said,

> And last time, I told my sister, . . . and she said that he touches her too. But then last time I saw him touching [Maren]. So then when my mom was setting up my party last time, I told her about it, and she was happy that I told her.

Later, the interviewer said to Sister 2, "You told me that you saw him do it to [Maren]?" Sister 2 responded, "Yeah. But I think it was, like, on land, not on water." She then explained that she "saw him putting his hand near where her private is" but that "then [Sister 1] wanted [Sister 2] to play with her, so [Sister 2] went over there." When asked if she knew whether it had "happened to anyone else" besides her, Sister 1, and Maren, Sister 2 replied, "No. I only [saw] him do it once to [Maren]."

¶16    While on the witness stand, Sister 2 identified Arellano in the courtroom as the one who touched her. She testified that Arellano touched her under the water while they were swimming "in lakes" and at the Virgin River waterfall. She also recalled that Arellano and Wife "sometimes" took her and Maren to the bathroom while they were camping.

¶17    Maren's mother testified through an interpreter, as follows, about how she learned of the abuse and what she did thereafter:

> Q.    Please describe . . . how you came into knowledge of what [Maren] said.
>
> A.    How did I find out?
>
> Q.    Yes.
>
> A.    [The Sisters' mother] talked to me on Sunday.
>
> Q.    And what did she tell you?

A.      That . . . [Arellano] was touching the three girls.

Q.      And what did you do then?

A.      I said we had to make a complaint right away.

Q.      And then what happened?

A.      We made the complaint.

Q.      Did you ask [Maren] what had happened?

A.      Yes.

Q.      What did you ask her?

A.      If [Arellano] had touched her in an inappropriate way.

Q.      And based on what [Maren] told you, how did that make you feel?

A.      Me?

Q.      Yes.

A.      Just completely destroy[ed], because we were like a big family, all of us.

¶18    After the State rested, Counsel moved for a directed verdict on the charges related to Maren. Counsel argued that "a necessary part of the State's case is identification." He noted that "having [been] given multiple opportunities and even a little bit of coaching," Maren had been "unable to identify" Arellano. And he contended that because there was "no identification from [Maren]," the charges related to her should be dismissed. The

district court stated that it was initially "concerned about the identification issue." But it noted that Sister 2 said in her CJC interview that she saw Arrellano touch Maren. On that basis, the court determined that there was evidence identifying Arrellano as the person who abused Maren, and it denied the motion for a directed verdict.

¶19 Arellano, Wife, Arellano's son, and four of Arellano's friends testified during Arellano's case-in-chief. Several of these witnesses testified that they never saw Arellano alone with any children during any camping trips. On direct examination by Counsel, Wife testified that during a September 2019 trip to Baker Dam, she and Arellano took the Sisters and Maren to the bathroom. During that examination, the following exchange occurred, with Wife testifying through an interpreter:

> Q.    What happened when you got to the restroom?
>
> A.    [Sister 1] and [Sister 2] went into the bathroom.
>
> Q.    Okay. But [Maren] was not there?
>
> A.    She was out there.
>
> Q.    Oh, she was at the restroom, too?
>
> A.    Outside, yes.
>
> Q.    Outside—explain to me where.
>
> A.    Outside of the bathroom door.
>
> Q.    So she did not go inside the restroom?
>
> A.    At first [the Sisters] went in.

Q.     Okay.

A.     After—

Q.     When—stop. When the two sisters, we're talking about [Sister 2] and [Sister 1], they went in the restroom together, did you wait outside?

A.     Yes, sir.

Q.     And did you wait outside with [Arellano]? Were you with [Arellano] the entire time?

A.     Yes, the whole time.

Q.     And where was [Maren]?

A.     Next to us.

Q.     Okay. And you never saw [Maren] alone with [Arellano]?

A.     No, sir.

Q.     Okay. So [Sister 2] and [Sister 1] went in, [and] I guess they came out.

At this point, the State objected on the basis that Counsel was leading the witness, and the court sustained the objection. Counsel's questioning of Wife then continued:

Q.     You said [Sister 2] and [Sister 1] went in. What happened next?

. . . .

A.     [Maren] and [Sister 2] went in.

Q.     And then what happened?

A.     They came out.

Q.     Okay.

A.     And I went in with [Sister 2].

Q.     And you said—okay. Stop. Who went in first to the restroom?

A.     [Sister 2] and [Sister 1].

Q.     And did they come out?

A.     Yes.

Q.     And then did you go in?

A.     At the end.

Q.     Did you go in with any of the girls?

A.     Yes, sir.

Q.     Which one?

A.     With [Sister 2].

Q.     Okay. Where was [Sister 1]?

A.     Outside.

Q.     And where was [Arellano]?

A.     Also outside.

Q.     And where was [Maren]?

A. Both girls were outside and [Arellano] was also outside, right next to the door.

. . . .

Q. . . . So you said that [Sister 2] and [Sister 1] came out of the restroom?

A. Yes, sir.

Q. And then you went back into the restroom with [Sister 2]; is that correct?

A. Yes, I went in.

Q. With [Sister 2]?

A. Yes.

Q. Why?

A. Because I also wanted to use the bathroom.

Q. Okay. And [Sister 2] just went with you?

A. Yes.

Q. But [Arellano] stayed outside?

A. Yes.

Q. And that was with [Sister 1]?

The State objected to this last question as also being leading, and the court instructed Counsel to "[t]ry not to lead" the witness. Counsel then asked, "So when you were done, what happened next?" Wife said, "We went out. The little girls were standing

together. My husband was standing to the side. And we left to the camp[], which was very close."

¶20 The jury found Arellano guilty on all six counts of sexual abuse of a child. Arellano now appeals.

ISSUES AND STANDARDS OF REVIEW

¶21 On appeal, Arellano asserts that the district court erred by denying his motion for a directed verdict after the State's case-in-chief. "We review the district court's denial of a motion for directed verdict for correctness." *State v. Barner*, 2020 UT App 68, ¶ 9, 464 P.3d 190 (cleaned up). "We will uphold the district court's denial if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt." *Id.* (cleaned up).

¶22 Arellano also asserts that Counsel provided ineffective assistance by eliciting testimony from Wife that was damaging to Arellano's defense. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Craft*, 2017 UT App 87, ¶ 15, 397 P.3d 889 (cleaned up).

ANALYSIS

I. Directed Verdict

¶23 Arellano asserts that the trial court erred by denying his motion for a directed verdict on the two charges related to Maren "based on lack of proper identification." We disagree.

¶24 "It is well-settled that an essential element that the government must prove beyond a reasonable doubt is the identification of a defendant as the person who perpetrated the crime charged." *State v. Isom*, 2015 UT App 160, ¶ 23 n.2, 354 P.3d 791 (cleaned up). "It is equally well-established that identification can be inferred from circumstantial evidence; therefore, direct, in-court identification is not required. A witness need not physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime." *Id.* (cleaned up).

¶25 Arellano correctly notes that when Maren testified, she did not directly identify him as the one who touched her. Yet it was not necessary for Maren to identify Arellano during her testimony as the person who inappropriately touched her; rather, all that was needed "was some evidence from which a reasonable jury could find beyond a reasonable doubt" that Arellano touched Maren. *State v. Holsomback*, 2022 UT App 72, ¶ 24, 513 P.3d 82 (cleaned up). The State presented such evidence.

¶26 Maren testified that the person who abused her was a person she knew as her "tío" and that her "tío" was among those with whom her family and others would go camping. She testified that her "tío" touched her inappropriately while at the bathroom at Baker Dam, and Wife confirmed that she and Arellano took Maren and the Sisters to the bathroom at Baker Dam.

¶27 Sister 2 said that she saw Arellano "touching [Maren]"—"on land, not on water"—by "putting his hand near where her private is." Sister 2—after explaining that she learned of Arellano's abuse of Sister 1 and Maren—said that she "told her [mom] about [the abuse]." Maren's mother then testified that the Sisters' mother told her "that [Arellano] was touching the three girls." Maren's mother said that she asked Maren if Arellano "had touched her in an inappropriate way" and that "what [Maren]

told [her]" in response led them to "make a complaint" and made her feel "[j]ust completely destroy[ed]."

¶28 From the foregoing circumstantial evidence, the jury could reasonably infer that Arellano was the person who sexually abused Maren at the Baker Dam campground. Accordingly, we affirm the district court's denial of Arellano's motion for a directed verdict on the charges related to Maren.

## II. Ineffective Assistance of Counsel

¶29 Arellano next asserts that Counsel rendered ineffective assistance by eliciting testimony from Wife that was "damaging to Arellano and his claim of innocence." We are not persuaded.

¶30 To succeed on his claim, Arellano must first "show that [C]ounsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, Arellano "must show that the deficient performance prejudiced the defense." *Id.* Arellano "must establish both deficient performance and prejudice, and if either is lacking, the claim fails and this court need not address the other." *State v. Bush*, 2025 UT App 87, ¶ 20, 572 P.3d 449 (cleaned up), *cert. denied*, Jan. 1, 2026 (No. 20251389).

¶31 To show deficient performance, Arellano "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* ¶ 21 (cleaned up). "Deficient performance is not determined in a vacuum; rather, it involves asking whether the strategy Counsel employed was that of a reasonable, competent lawyer . . . ." *State v. Wilkes*, 2020 UT App 175, ¶ 24, 479 P.3d 1142 (cleaned up). "The ultimate question is always whether, considering all the circumstances, Counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350 (cleaned up).

¶32 Arellano has not demonstrated deficient performance by Counsel. Arellano was charged with sexually abusing Maren at

the Baker Dam bathroom. He concedes that it was reasonable for Counsel to call Wife as a witness. He also does not assert deficient performance in Counsel's initial questioning of Wife about her and Arellano taking Maren and the Sisters to the bathroom. Specifically, Arellano approves of Counsel's questioning of Wife to the point where she testified that she waited with Arellano and Maren outside the bathroom "the whole time" the Sisters were inside. But Arellano contends that when the State objected to Counsel's next question being leading, this "would have been a good opportunity for [Counsel] to move on" and not "continue[] down the pathway asking questions that elicited information that was damaging to Arellano." Arellano argues that because Counsel "had already worked so hard to put forth evidence from several witnesses involved on the many camping trips testifying that Arellano was never alone with any children," Counsel's further questioning that elicited testimony that Arellano was left "alone with two of the girl[s]" outside the bathroom amounted to "improper questioning" and a failure to "adequately prepare" Wife to testify. Not so.

¶33 A frequently used litigation tactic is that of "taking the sting out." *See* Michael J. Saks, *Flying Blind in the Courtroom*: *Trying Cases Without Knowing What Works or Why*, 101 Yale L.J. 1177, 1180 (1992). "Conventional tactical wisdom holds that [an attorney] should try to present [negative] information to the jury before [the attorney's] adversary gets the chance to, so as to 'take the sting out' of the evidence or increase the perception of [the attorney's] credibility or fairness." *Id.* Arellano concedes that it was reasonable for Counsel to call Wife as a witness and elicit her testimony that she, Arellano, and Maren waited together outside the bathroom "the entire time" the Sisters were in the bathroom. But reasonable counsel would have known that the trip to the bathroom did not end there and that if Counsel did not elicit testimony from Wife to complete the narrative to the point when the children arrived back in camp, the prosecutor likely would. Thus, reasonable counsel could have chosen to reveal that Wife

went into the bathroom with Sister 2, leaving Arellano outside with Sister 1 and Maren. Failure to reveal this on direct examination could have suggested to the jury that Counsel was being less than transparent, thus harming his—and by extension Arellano's—credibility before the jury. Moreover, "adequately prepar[ing]" Wife to tell this part of the narrative could not include Counsel advising her to change her story or otherwise testify untruthfully. *See* Utah R. Prof. Conduct 3.3(b) ("A lawyer must not offer evidence that the lawyer knows to be false.").

¶34 Because we can conceive of a tactical reason for Counsel to have elicited the testimony of which Arellano now complains— namely to "take out the sting" associated with Wife's continuing narrative—we must conclude that Counsel's performance in this regard was not deficient. *See State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 ("The court gives trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." (cleaned up)). Thus, Arellano's ineffective assistance of counsel claim fails.

## CONCLUSION

¶35 The trial court did not err in denying Arellano's motion for a directed verdict, and Counsel did not render ineffective assistance by asking Wife about what occurred at the campground bathroom up through the point where she and Arellano and the girls returned to their camp. Accordingly, we affirm.

———————