2026 UT App 1

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ALLEN MICHAEL ALLRED,
Appellant.

Opinion
No. 20230738-CA
Filed January 2, 2026

First District Court, Logan Department
The Honorable Angela Fonnesbeck
No. 221100513

Brian Craig, Attorney for Appellant

Derek E. Brown and Daniel L. Day,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1 Allen Michael Allred admitted to sexually abusing his young stepdaughter on multiple occasions. He pled guilty to several charges and was sentenced to significant prison sentences. About four months after he was sentenced, the district court entered a continuous protective order that barred any contact whatsoever with not only his stepdaughter but also all other members of the household, including Allred's biological children. Allred opposed these conditions, claiming the scope of the continuous protective order was not statutorily authorized and that the proceedings below were defective such that the order should be vacated. We reject all of Allred's arguments and affirm.

BACKGROUND

¶2 Allred is the father of three minor children with his wife, who is also the mother of Allred's stepdaughter. Allred called a sex offender hotline and disclosed that he had sexually abused his stepdaughter, who was then nine years old. This disclosure resulted in the State charging Allred with ten counts of aggravated sexual abuse of a child. As part of a plea deal, Allred admitted that he sexually abused his stepdaughter three times over a one-year period by touching her breasts, genitals, and buttocks for the purpose of sexual arousal. Ultimately, Allred pled guilty to three counts of aggravated sexual abuse of a child, and the State dismissed the remaining counts.

¶3 Allred received a psychosexual risk assessment (risk assessment) for sentencing purposes. In that risk assessment, he stated that he had touched his stepdaughter's buttocks multiple times, touched her breasts a few times as they were just starting to develop, and touched her vaginal area once. He conveyed that while he "knew it was wrong" and had "no idea why he offended," he "could not refrain" from doing it. He indicated that he had been "trying to get help for a while" to address his aberrant behavior, including by going to therapy, but he was "not able to say anything" even though he knew that he "needed help." He stated that he had "always been too afraid and ashamed to talk about his sexual attraction to children." He further admitted to having an interest in looking at pornographic images of children between the ages of ten and fourteen and that he had used the internet to find images of nude children.

¶4 In preparation for sentencing in December 2022, the district court reviewed the risk assessment and the presentence investigation report. The court found the following to be aggravating factors incident to the abuse Allred inflicted on his stepdaughter: (1) that the abuse occurred on multiple occasions over the course of ten months, (2) that Allred committed the abuse when he enjoyed a position of trust with respect to his

stepdaughter, and (3) that Allred manipulated his wife so that he could "have continuing and additional access to" his stepdaughter and "opportunities to touch" her. The court specifically pointed out that Allred had encouraged "the purchasing of dresses for this child to wear and shaming the child when the child refused to hug [him] at bedtime or when [he] came home." The court stated, "That is the type of manipulation that this Court takes very seriously. To gain ongoing and additional access to children for your own purposes, your own sexual pleasures, it is heinous, Sir, and those are the very types of things that this Court has been asked to take into consideration for this grievous sex offense that you perpetrated against a child." The court acknowledged as mitigating factors Allred's minimal criminal history, his "moderate low" recidivism risk, and the fact that he voluntarily disclosed the abuse. Taking all the circumstances into consideration, the court sentenced Allred to three concurrent prison terms of fifteen years to life.

¶5 About a month after sentencing, Allred's counsel withdrew. And in April 2023, the State filed a request for a continuous protective order (CPO), which the court granted on May 4, 2023. "[H]aving determined by clear and convincing evidence" that the stepdaughter had a "reasonable fear of future harm or abuse," the court enjoined Allred (1) "from threatening to commit or committing violence against" the stepdaughter or any of her family or household members, (2) from communicating with the stepdaughter "directly, indirectly, or through a third party," and (3) from going "within 1,000 feet" of the stepdaughter or any of her family or household members. The order also required Allred "to stay away from the residence, school, [and] place of employment" of the stepdaughter or "any other place" frequented by the stepdaughter or any of her family or household members. Before entry of the CPO, Allred was not notified of the State's request or his right to request a hearing on it.

¶6 After being served with the CPO on May 17, 2023, Allred retained new counsel, and, some five days later, he filed a motion

to modify the CPO. Specifically, Allred requested that the restrictions on contact with his three biological children be removed. He pointed out that, as he understood it, the CPO prohibited him from even writing letters to his biological children while he was incarcerated and possibly prevented his mother (their grandmother) from communicating with the children because such action could be considered communicating "indirectly, or through a third party," with his stepdaughter. Allred proposed that the CPO be modified to allow his biological children, once of sufficient age, to visit him in prison or communicate with him through video or phone calls. Another alternative Allred proposed was to allow contact with his biological children to resume after his stepdaughter turned eighteen in 2030. Allred's motion disclosed that there was a hearing in a pending divorce proceeding involving his wife set for August 2023 and that an existing cohabitant abuse protective order barring contact with his wife, his stepdaughter, and his three biological children was in place until June 2025.

¶7     Allred appeared with counsel at a hearing on the motion to modify the CPO on June 21, 2023. Allred argued that the protective order statute should not be read to allow the court to prohibit contact with his biological children. Allred also highlighted what he claimed were several procedural defects with the CPO: (1) it was issued more than four months after sentencing, (2) Allred was not represented by counsel when the CPO was issued, and (3) the CPO was issued before he was provided notice of his right to a hearing. Finally, Allred argued that the cohabitant abuse protective order that existed in the divorce case should be left in place while allowing "the divorce case to run its course." He argued against having "a full evidentiary hearing of calling a bunch of witnesses" in the current matter when making such factual determinations was "more appropriate" in the context of the pending divorce case. Given these circumstances, Allred asked that the CPO be modified to expand the contact he could have with his biological children.

¶8 In response, the State defended the CPO's inclusion of the biological children by arguing that the protective order statute—notwithstanding what the State believed was an obvious typographical error—clearly allowed the court to extend protections to other household members. In addition, the State argued that Allred's "proclivities toward minors, not just his stepdaughter, but all minors," put "the entire community at risk." The State also asserted that the victim impact statements and the admissions Allred made during presentencing and the risk assessment, which were in the record, provided evidence of the "crippling fear" that had "affected not just the [stepdaughter], but the entire family." The State further argued that any procedural defects underlying the CPO had been remedied by the fact that Allred was being heard, with counsel, on his motion to modify.

¶9 The district court denied Allred's motion to modify the CPO. In so ruling, the court acknowledged that Allred had not received notice—before entry of the CPO—of his right to request a hearing. And it expressed concern with the "late timing of the issuance" of the CPO some four months after sentencing. However, the court indicated that its concerns were "alleviated" because Allred did not dispute the legitimacy of the CPO with respect to his wife and his stepdaughter and because the notice problem would likely be rectified by the hearing on the motion to modify. The court also concluded that the statute authorized the inclusion of Allred's biological children in the CPO because they lived in the same household as his stepdaughter.

¶10 Allred later moved for reconsideration, arguing that his due process and confrontation rights had been violated by the lack of an evidentiary hearing regarding the CPO. The court concluded that no evidentiary hearing was necessary since it had been able to make a determination based on the facts before it. Moreover, the court noted that Allred had waived any right to an evidentiary hearing by not requesting witness examination before or during the hearing on his motion to modify. Allred appeals.

ISSUES AND STANDARDS OF REVIEW

¶11 Allred first claims that the district court incorrectly determined that the continuous protective order statute allows the inclusion of other household members after conviction. A district court's interpretation of a statute presents a question of law that we review for correctness. *State v. Cooke*, 2025 UT 6, ¶ 19, 567 P.3d 541.

¶12 Allred's second assertion is that the district court erred when it concluded that any defects related to the CPO being entered more than four months after sentencing and without the statutorily required notice had been cured by the subsequent hearing on the motion to modify. The district court's rulings in this regard are legal conclusions that we review for correctness. *State v. Tennyson*, 850 P.2d 461, 472 (Utah Ct. App. 1993).

¶13 Third, Allred argues that the district court violated his due process rights by issuing the CPO without first holding an evidentiary hearing. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." *State v. Winter*, 2024 UT App 98, ¶ 9, 554 P.3d 355 (cleaned up), *cert. denied*, 558 P.3d 88 (Utah 2024).

¶14 Allred's fourth claim is that the district court violated his Sixth Amendment rights to counsel and confrontation when it entered the CPO without counsel present and without providing him an opportunity to cross-examine witnesses. Constitutional issues present a question of law, which we review for correctness. *Id.*

¶15 Allred's final assertion is that the district court abused its discretion when it held that clear and convincing evidence supported barring all contact between him and his biological children. A district court's conclusion that clear and convincing evidence was presented is reviewed deferentially, and this court will reverse that determination only if that decision is clearly erroneous. *Jacob v. Bate*, 2015 UT App 206, ¶ 13, 358 P.3d 346.

## ANALYSIS

### I. Inclusion of Other Household Members

¶16     Allred argues that the district court erred in interpreting the continuous protective order statute to allow the CPO to include other household members. We disagree.

¶17     The district court correctly identified a problem with the statute in question. In relevant part, at the time, the statute stated, "[A] continuous protective order is permanent . . . and may include any order described in Subsection 78B-7-804(3)(c)." Utah Code Ann. § 78B-7-805(3)(c) (LexisNexis 2022). But subsection 804(3)(c) did not describe any orders. Instead, it addressed notice procedures and processes.[1] The district court determined that the cross-reference certainly should have been to subsection 804(3)(d). Unlike subsection 804(3)(c), subsection 804(3)(d) explicitly addressed—and still addresses—what a continuous protective order "may include." *Id.* § 78B-7-804(3)(d); *see also* Utah Code § 78B-7-804(3)(d) (2025).[2] The district court concluded that

---

1. That subsection provided,
> (i)    The court shall notify the perpetrator of the right to request a hearing.
> (ii)   If the perpetrator requests a hearing under this Subsection (3)(c), the court shall hold the hearing at the time determined by the court. The continuous protective order shall be in effect while the hearing is being scheduled and while the hearing is pending.

Utah Code Ann. § 78B-7-804(3)(c) (LexisNexis 2022).

2. That subsection provided,
> A continuous protective order is permanent . . . and may include:

(continued…)

the CPO could extend to household members based on its determination that the statute suffered from the infirmity just described, noting that the legislature intended to reference subsection 804(3)(d) instead of subsection 804(3)(c) since "it would make no sense to say that an order could include [certain] items and then not point to the section that includes those items." The district court's conclusion was correct.

¶18 Where, as here, a statute's language yields a meaningless contextual result, the absurdity doctrine comes into play. Courts will apply the absurdity doctrine when "the operation of the plain language is so overwhelmingly absurd that no rational legislator could have intended the statute to operate in such a manner. This standard is satisfied only if the legislature could not reasonably have intended the result." *Bagley v. Bagley*, 2016 UT 48, ¶ 28, 387 P.3d 1000 (cleaned up); *see also Garfield County v. United States*,

---

    (i)   an order enjoining the perpetrator from threatening to commit or committing acts of domestic violence against the victim or other family or household member;

    (ii)  an order prohibiting the perpetrator from harassing, telephoning, contacting, or otherwise communicating with the victim, directly or indirectly;

    (iii) an order prohibiting the perpetrator from going to the victim's residence, school, place of employment, and the premises of any of these, or a specified place frequented regularly by the victim or any designated family or other household member;

    (iv) an order directing the perpetrator to pay restitution to the victim as may apply, and shall be enforced in accordance with Title 77, Chapter 38b, Crime Victims Restitution Act; and

    (v)  any other order the court considers necessary to fully protect the victim and members of the victim's family or other household member.

Utah Code Ann. § 78B-7-804(3)(d) (LexisNexis 2022).

2017 UT 41, ¶ 47, 424 P.3d 46 (Voros, J., dissenting) ("A relatively non-controversial use of the absurdity doctrine is to correct obvious linguistic errors, [such as when] the error in the statute is so unthinkable that any reasonable reader would know immediately both (1) that it contains a technical or ministerial mistake, and (2) the correct meaning of the text." (cleaned up)).

¶19 This standard is met here. Clearly, this is not a matter of declaring the cross-reference a clerical error because we disagree with the legislature's rationale. Rather, this is an instance of discerning the obvious intent of the legislature because the cross-reference does not address the matter in the referring statute. It would be illogical and unreasonable to read the cross-reference in the enacted statute literally because it does not make sense as it was written. Indeed, while we are generally "obligated to enforce the statute as written and give effect to the intention of the legislature as expressed in the unambiguous words of the statute," we need not do so if "there is an obvious error, such as a typographical error, or [if] application of the literal language of the statute would produce an absurd result." *Farmers Texas County Mutual Ins. Co. v. Romo*, 250 S.W.3d 527, 539 (Tex. App. 2008); *see also Caudill v. Commonwealth*, 120 S.W.3d 635, 676 n.4 (Ky. 2003) (concluding that jury instructions "conformed to the obviously intended meaning of [a] statute" when the enacted statutory "language [made] no sense and [was] an obvious typographical error"); *Stanton v. Frankel Bros. Realty Co.*, 158 N.E. 868, 870 (Ohio 1927) ("It is a well-settled rule that courts will not permit a statute to be defeated on account of a mistake or error, where the intention of the Legislature can be collected from the whole statute, or where one word has been erroneously used for another, and where the context affords means of correction. The strict letter of a statute must yield to the obvious intent."). This conclusion is especially true in the case of something like what we have here: an obvious error in a cross-reference. *See United States v. Coatoam*, 245 F.3d 553, 559 (6th Cir. 2001) (stating that the "very language of the statute . . . compels our conclusion that Congress intended . . . to cross-reference readers to a related statute" instead of the

statute indicated in the text); *King v. Housing Auth.*, 670 F.2d 952, 954 n.4 (11th Cir. 1982) (concluding that a cross-referenced subsection in the Code of Federal Regulations was a typographical error because the referenced section did not concern the material in the referring regulation).

¶20　That the cross-reference in Allred's case was incorrect is supported by two compelling considerations. First, the statute defies logic as written. As the district court correctly noted, it would make no sense for section 78B-7-805(3)(c) to point to an obviously irrelevant subsection when the obviously relevant subsection immediately followed it. We have no reticence concluding that the legislature intended the cross-reference to point to subsection 804(3)(d) instead of subsection 804(3)(c). Any other conclusion runs counter to reason. Second, the error has since been corrected. Indeed, the intention of the legislature has been definitively resolved by the latest amendment of the continuous protective order statute. It now cross-references subsection 804(3)(d) instead of subsection 804(3)(c). *Compare* Utah Code Ann. § 78B-7-805(3)(c) (LexisNexis 2022), *with* Utah Code § 78B-7-805(3)(c) (2025). This corrective amendment closes the door to any doubt about which section the legislature intended to cross-reference.

¶21　Given the obvious—and now corrected—error in cross-referencing an irrelevant subsection, we have no trouble concluding that the district court's interpretation was correct. Accordingly, Allred's first argument fails.

## II. Notice and Delayed Entry

¶22　Allred next complains that the CPO was (1) entered without proper notice and (2) delayed in entry. He contends that he should have been notified, before entry of the CPO, of his right to request a hearing under the provisions of the continuous protective order statute. *See* Utah Code Ann. § 78B-7-805(3)(b)(i) (LexisNexis 2022) (providing that the "court shall notify the perpetrator of the right to request a hearing" regarding the

issuance of a continuous protective order). He further asserts that the court erred in entering the CPO more than four months after sentencing; as he interprets the statute, any such order needed to have been issued at the time of sentencing. *See id.* § 78B-7-805(3)(a) ("[T]he court may issue a continuous protective order at the time of the conviction or sentencing limiting the contact between the perpetrator and the victim if the court determines by clear and convincing evidence that the victim has a reasonable fear of future harm or abuse."). We are not persuaded. With regard to the notice issue, Allred has not articulated how he was harmed by these defects. And with regard to the delayed entry issue, Allred has not shown that the district court's statutory interpretation was incorrect.

A.     Notice

¶23     "A mere technical violation of a rule is insufficient to justify relief without a showing of prejudice." *State v. Collins*, 2014 UT 61, ¶ 42, 342 P.3d 789 (cleaned up); *see* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."); *cf. State v. Goodrich*, 2016 UT App 72, ¶ 20, 372 P.3d 79 ("The failure to provide . . . notice [in probation violation proceedings] only constitutes reversible error when lack of notice is prejudicial to the defendant."). And an "error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *State v. Zimpfer*, 2024 UT App 136, ¶ 58, 558 P.3d 111 (cleaned up).

¶24     The district court acknowledged that the CPO lacked the required notice, and the State conceded the point. But Allred has never claimed that he did not know he could request a hearing or that he did not get a hearing. In fact, he requested a hearing to modify the CPO within five days of when it was served on him. And the hearing on his motion took place less than a month later. This timeline shows that Allred was well aware of his right to a

hearing and that the court promptly responded to his request. Given this set of facts, we simply do not see how Allred was harmed by the initial lack of notice of the State's CPO request. And Allred has made no attempt to identify any prejudice he suffered apart from the violation of the rule. *See Goodrich*, 2016 UT App 72, ¶ 24 (concluding that "there [was] no cause for reversal" and that "the outcome of the proceedings was not affected" even if the district court erred in providing a defendant notice, because the defendant was "present," "aware of the allegations against him," and "defended himself against those allegations"); *accord Brinkerhoff v. Schwendiman*, 790 P.2d 587, 589 (Utah Ct. App. 1990); *cf. Collins*, 2014 UT 61, ¶ 42 ("A defendant who actually files an appeal or has independent knowledge of the right to appeal, including the relevant filing deadline, has not been prevented from proceeding with an appeal and suffers no harm."). Given the absence of any identifiable harm, this assertion of error fails.

B.     Delayed Entry

¶25     As to the delayed entry of the CPO, Allred has not shown that there was any error in the district court's entry of the CPO some four months after sentencing. Indeed, the statutory scheme allows a court to issue a continuous protective order at times other than conviction or sentencing: "[I]n addition to the process of issuing a continuous protective order [at the time of conviction or sentencing], a district court may issue a continuous protective order at any time" if the victim petitions for one. Utah Code § 78B-7-805(5).[3] This statute clearly establishes that there is no prohibition on issuing a postsentencing CPO. So, while Allred correctly observes that the court "may" issue a CPO at sentencing, *id.* § 78B-7-805(3)(a), a court "may" also issue a CPO at a later time,

---

3. While this statute refers to the victim petitioning for the protective order, in fact, "[a]ny interested person may file a petition for a protective order . . . on behalf of a child who is being abused or is in imminent danger of being abused by any individual." Utah Code § 78B-7-202(1)(a)(i).

*id.* § 78B-7-805(5). Moreover, the statute's use of "may" in subsection 805(3) is not restrictive, as Allred suggests. Indeed, Allred reads the statute as "requir[ing] issuance" of the CPO at the time of sentencing. But he is mistaken because this is not how "may" works. It is well established that "the term 'may' is generally construed to be permissive and not mandatory and is generally not interpreted to limit options, but, rather, to clearly define some of those options." *State v. Gallegos*, 967 P.2d 973, 978 (Utah Ct. App. 1998) (cleaned up); *accord Sanchez v. State*, 2025 UT App 78, ¶ 12, 571 P.3d 816; *State v. Diviney*, 2021 UT App 106, ¶ 22, 500 P.3d 883. In other words, the use of "may" indicates that a court has the option of issuing a CPO at the time of sentencing or conviction, not that it can do so only at that time or that it cannot exercise that option at some other time. Accordingly, this claim of error also misses the mark.

## III. Due Process

¶26    Allred next contends that the district court violated his due process rights by issuing the CPO "without the opportunity for an evidentiary hearing" in a matter "involving a fundamental right to sustain a parent-child relationship." This claim of error is without merit for several reasons.

¶27    First, Allred has not shown that he was entitled to an evidentiary hearing under the circumstances of his case. "A district court should hold an evidentiary hearing when it cannot make a determination as to whether a protective order is appropriate on the face of the pleadings." *Hedgcock v. Hedgcock*, 2009 UT App 304, ¶ 13, 221 P.3d 856. At the risk of stating the obvious, here there was ample evidence supporting the issuance of the CPO through the guilty plea and sentencing materials, including Allred's own admissions in the risk assessment and the victim impact statements. These materials provided evidence—the accuracy of which Allred has not challenged—that Allred presented an ongoing threat to his biological children, that he was interested in looking at pornographic images of children between

the ages of ten and fourteen, and that he had an addiction to child pornography. In particular, Allred's wife described him as being untrustworthy, deceitful, manipulative, aggressive, and entitled. She further revealed, "I believe that he set me up in his asking me on multiple occasions to buy [his stepdaughter] more dresses. While a healthy father might see little girls in dresses as precious, I remember upon first meeting him how much he said he was hugely attracted when women wore dresses." Importantly, Allred has not challenged the accuracy of any of this information, all of which was before the court when it entered the CPO. *See Robinson v. Robinson*, 2010 UT App 96, ¶ 14, 232 P.3d 1081 ("Although factual disputes ordinarily require a complete evidentiary hearing, there is simply no need for such a hearing when, as here, all factual disputes are immaterial to the district court's decision."); *see also Beltran v. Allan*, 926 P.2d 892, 898 (Utah Ct. App. 1996) ("There is no dispute to these facts, and an evidentiary hearing would be of no benefit."); *cf.* Utah Code § 77-18-103(5)(c) ("If a party fails to challenge the accuracy of the presentence investigation report at the time of sentencing, the matter shall be considered waived.").[4]

¶28　Second, Allred received the hearing he requested. After being served with the CPO, Allred promptly retained counsel and filed a motion to modify. At the hearing, Allred appeared with his attorney and confirmed that he was ready for oral arguments on his motion. Allred asserted that the divorce-case protective order (the one set to expire in 2025) should be allowed "to run its course" and that "a full evidentiary hearing" would be better suited in that case. His counsel suggested, "I don't think this Court wants to have a full evidentiary hearing of calling a bunch of witnesses and determining when there's already pending other related litigation." Only after the district court denied his motion

---

4. While Allred states in his brief that the district court "relied upon evidence proffered by the State in support" of the CPO that he "refutes" and "disputes," he has made no effort to specify any of those disputations.

to modify did Allred complain—in his motion for reconsideration—that he was denied an evidentiary hearing. Allred cannot complain that the district court did what he asked of it regarding the evidentiary hearing with respect to the CPO. Not getting the relief he wanted does not retroactively entitle Allred to another bite at the apple. By proceeding with arguments at the motion hearing and indicating that an evidentiary hearing was more appropriate for the pending divorce proceedings, Allred waived his right—insofar as any right existed—to cross-examine witnesses at that hearing.

¶29 For these reasons, Allred's third assertion of error fails.

### IV. Sixth Amendment

¶30 Allred next asserts that his Sixth Amendment rights to counsel and to confront witnesses were violated. Again, we disagree.

### A. Right to Counsel

¶31 Allred argues that his right to counsel was violated when the CPO was entered while he did not have counsel. He argues that the CPO was equivalent to the termination of his parental rights and—given such significant consequences—constituted a critical stage of the criminal proceeding. We disagree.

¶32 Even if the right to counsel was somehow triggered in the CPO proceedings, Allred has not shown how he was prejudiced by this denial of his perceived right to counsel. Indeed, he has not even attempted to address the matter in briefing, and this is almost certainly attributable to the fact that Allred suffered no prejudice from the absence of counsel at the moment of the CPO's entry. Indeed, within a day of being served, Allred obtained counsel and was later heard on his challenge, where the matter was litigated and his motion to modify was denied. Moreover, section 78B-7-805(3)(b) leaves no doubt that the CPO would have been issued initially regardless of whether Allred had an attorney

at the time. *See* Utah Code § 78B-7-805(3)(b)(ii) ("If the perpetrator requests a hearing under this Subsection (3), the court shall hold the hearing at the time determined by the court and the continuous protective order shall be in effect while the hearing is being scheduled and while the hearing is pending."). Therefore, even if Allred was represented by counsel at the time the State requested the CPO, there is nothing in the statute to suggest that the issuance of the CPO would have been delayed or that it would not have taken effect during the time before the hearing. In short, Allred's temporary lack of counsel simply had no discernible effect on the entry of the CPO or its implementation during the pendency of the hearing.

B.     Right to Confrontation

¶33     Allred next asserts that by not allowing him to confront witnesses during the hearing on his motion to modify the CPO and by not later allowing him to have the benefit of an evidentiary hearing, the district court violated his confrontation right. Again, we disagree.

¶34     Allred cites no authority that the right to confrontation extends to collateral matters such as a CPO proceeding. Indeed, "while the Confrontation Clause protects a defendant's trial right to confront testimony offered against him to establish his guilt, it has never extended beyond the confines of a trial." *United States v. Osmakac*, 868 F.3d 937, 956 (11th Cir. 2017) (cleaned up); *see also Wolff v. McDonnell*, 418 U.S. 539, 567 (1974) ("Confrontation and cross-examination . . . are essential in criminal trials where the accused, if found guilty, may be subjected to the most serious deprivations, . . . [b]ut they are not rights universally applicable to all hearings."); *United States v. Campbell*, 743 F.3d 802, 807–08 (11th Cir. 2014) (stating the same proposition and collecting cases in support).

¶35     In addition, Allred waived his confrontation right when, at the motion hearing, he indicated that an evidentiary hearing and the cross-examination of witnesses were more appropriate for the

pending divorce proceedings. *Hedgcock v. Hedgcock*, 2009 UT App 304, ¶ 13, 221 P.3d 856 (stating that nothing "prevents a party from waiving the right to present evidence at the hearing challenging a protective order").

¶36 For these reasons, Allred's Sixth Amendment claims both fall short.

## V. Evidence Supporting the CPO

¶37 Allred's final argument is that the district court erred in concluding that clear and convincing evidence supported barring all contact between him and his biological children through the CPO. Allred says the court did not make any specific findings to establish why he should be entirely prohibited from contact with his biological children and, in any case, there were less restrictive means to ensure the children's safety. Allred's assertions fall flat in every respect.

¶38 The district court did not abuse its discretion in finding that clear and convincing evidence supported issuing a CPO. There was compelling evidence that Allred presented a danger to all the children in the house. Allred had admitted to repeatedly abusing his stepdaughter over an extended period of time in the family home where his biological children lived. The risk assessment and presentence investigation report made clear his sexual interest in children. Moreover, the evidence showed that Allred had no reticence to engage in manipulative behavior to satisfy his sexual interest in children. Accordingly, the evidence of his sexual interest in children was clear and convincing in view of Allred's own admissions and actions. Given this uncontroverted evidence, we have no trouble concluding that the district court was justified in determining that his biological children should also be protected from Allred.

¶39 The less restrictive alternatives that Allred proposes all involve some sort of limited or supervised communication. But all these alternatives are plagued by the same infirmity. While it is

certainly true that the measures Allred suggests would mitigate the possibility of direct predatory contact, they do not address the emotional and mental impact that Allred's abuse had on the children and his wife. We simply cannot say that the district court abused its discretion in rejecting these alternatives as unworkable in light of the harm that Allred had brought to his family.

¶40 For these reasons, we are not persuaded by Allred's final claim of error.

CONCLUSION

¶41 Under the applicable statute, the district court did not err in extending the CPO to include other household members. Allred was not prejudiced by the initial lack of notice of the request for the CPO, and the district court did not violate the statute by entering the CPO more than four months after sentencing. Nor were Allred's due process rights, right to counsel, or confrontation right violated by how the CPO was issued. And the district court did not abuse its discretion in determining that clear and convincing evidence supported the CPO.

¶42 Affirmed.

_____